JOSEPH B. WEIRICK, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5191–72, 5192–72, 1539–73.    Filed June 27, 1974.

*Roy E. Crawford* and *Hart H. Spiegel,* for the petitioners.
*Nicholas G. Stucky,* for the respondent.

FEATHERSTON, *Judge:* Respondent determined the following deficiencies in petitioners' Federal income tax:

| Petitioner(s) | Taxable year | Deficiency |
|---|---|---|
| Joseph B. Weirick | 1963 | $1, 612. 00 |
| | 1964 | 4, 537. 40 |
| Joseph R. Weirick and Dorothy V. Weirick | 1964 | 2, 484. 00 |
| | 1966 | 6, 541. 35 |
| | 1967 | 92. 00 |
| | 1968 | 11, 456. 00 |
| Hugh W. Killebrew, Jr., and Eleanor F. Killebrew | 1964 | 400. 51 |
| | 1965 | 362. 39 |
| | 1966 | 622. 41 |
| | 1967 | 386. 77 |
| | 1968 | 1, 087. 35 |

The sole issue presented for decision is whether amounts spent for the construction and installation of ski lift cable-support and

[1] The proceedings of the following petitioners are consolidated herewith: Joseph R. Weirick and Dorothy V. Weirick, docket No. 5192–72; and Hugh W. Killebrew, Jr., and Eleanor F. Killebrew, docket No. 1539–73.

holddown towers and passenger ramps qualify for the investment credit provided by section 38.[2]

FINDINGS OF FACT

Petitioners in docket Nos. 5191–72 and 5192–72 were legal residents of California at the time they filed their petitions with this Court; petitioners in docket No. 1539–73 were legal residents of Nevada at the time their petition was filed.

Throughout the period in controversy, Joseph B., Joseph R., and Dorothy V. Weirick were shareholders in Weirick & Co. (hereinafter referred to as the company), an electing small business corporation which operated a ski resort known as China Peak in the Sierra Nevada Mountains. The company kept its books on the accrual basis using a fiscal year ending November 30.

Hugh W. Killebrew, Jr., during all relevant years, was a partner in a general partnership known as Heavenly Valley (hereinafter sometimes referred to as the partnership), which was engaged in the business of owning and operating a ski resort at South Lake Tahoe, Calif. He was also a partner in another partnership which held as its principal asset a partnership interest in Heavenly Valley. Both partnerships kept their books on the cash basis and used a calendar taxable year.

During the fiscal year ended November 30, 1966, and the calendar years 1964 through 1968, respectively, the company and the partnership expended substantial sums to construct and install ski lifts, all of which were of chairlift design. Each chairlift has an upper and a lower terminal; cable-support or holddown towers (line towers or towers) located between the terminals; a haul cable; sheave assemblies on the terminals and sheave assemblies on the line towers to support or hold down the haul cable; chairs; and a device for gripping the chairs to the haul cable. The equipment at the terminals includes a main drive motor, an optional auxiliary engine, gear reducer, receiver, shafts, couplings, electric controls, brakes, and counterweight assembly. Loading and unloading ramps are usually found at both the upper and lower terminals. The sheave assemblies on the line towers usually consist of four to eight rubber-tired pulleys on which the cable moves.

Ski lifts are planned by registered professional engineers. The design and configuration of a lift depends chiefly upon the terrain over which the lift is to be installed and upon other variables. These other variables include the overall vertical rise and horizontal length of the

---

[2] All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.

lift; average snow depth in the area, its effect on the lift's clearance requirements, and the pressure it will place upon the lift; maximum speed of the lift; maximum capacity, frequency of carriers (chairs), and carrier spacing; and the wind velocity and potential ice loading on the cable and chairs. These and other factors determine the horsepower requirement of the main drive motor, the counterweight size, and the specifications of the haul and counterweight cables.

Each ski lift has both drive equipment and a device for maintaining proper tension on the haul cable. The drive equipment is usually located at one of the terminals, and the tension device is located at the other. Each terminal tower which holds either the drive equipment or tension device is normally sunk in a concrete foundation containing from 50 to 100 cubic yards of concrete.

The "drive terminal" normally consists of a steel structure which supports and holds in place the drive bullwheel, brake assemblies, drive and auxiliary motors, gear assemblies, and drive shaft which is attached to the drive bullwheel.

The equipment at the "tension terminal" includes a bullwheel which moves back and forth so as to provide proper tension on the haul cable. Proper tension is necessary to prevent the cable from slipping on the drive bullwheel and to allow the braking system to function correctly. Usually, the bullwheel is attached to a carriage which moves back and forth on tracks located on the terminal structure. A counterweight is attached to the carriage by means of pulleys. When added tension is brought to bear on the bullwheel, it and the carriage move along the tracks toward the lift, and the counterweight is pulled up. As the pressure on the bullwheel is reduced, the counterweight descends, and the bullwheel and carriage return to their original position.

The line towers are located between the two terminals. These towers may be cable-support towers, cable holddown towers, or a combination of both. They are made from tubular steel pipe that is between 18 and 24 inches in diameter, and one-quarter to one-half inch in thickness. The towers have steel crossarms on which sheave assemblies are installed. The profile of the towers, i.e., their nature and location, depends primarily upon the terrain and the potential maximum snow depth over which the ski lift is constructed.

A line tower is either bolted to a reinforced concrete foundation or sunk into the foundation. Where the tower is sunk into the foundation, a metal sleeve slightly larger than the tower is, in some instances, imbedded into the cement when it is poured, and the tower is later inserted into the sleeve and welded to it. The size of the foundation (containing from 6 to 20 cubic yards of concrete) varies from 5 feet

by 8 feet to 11.5 feet by 12.5 feet, depending on the height of the tower, the lateral support provided by the surrounding soil, and other variables such as load and wind factors. The height of the towers varies from 24 to 54 feet above the ground. The bolted line towers are as permanent as the welded towers, and the welded towers are as easy to remove and reinstall as the bolted towers.

The footing design and the method of erecting the towers are essentially identical to the footing design and method of erecting the terminals. The principal difference is that the terminals are subject to more stress and, consequently, they are constructed with more steel and have a substantially larger concrete foundation.

After the tower profile has been determined, the installation of the sheave assemblies on the line towers is planned. The number of sheaves used on each tower and their configuration, as well as the number of towers at a particular site, depends upon whether the tower is a hold-down or a cable-support tower and the stress caused on each tower by the cable. The sheaves, each of which has a limited load capacity, are attached to the tower's steel crossarms, and for all practical purposes, the tower and the sheave assemblies are an inseparable and integral mechanism. When sheave assemblies become defective, it may be as economical to replace the towers and related sheave assemblies as to install new crossarms and sheave assemblies on existing towers.

The line towers are usually designed to last the life of the ski lift, and in the normal course of events are not moved once installed unless a design problem arises. However, once a ski lift has been installed, the line towers, as well as most other parts of the lift, can be moved, removed, or replaced when necessary.

The loading and unloading ramps are usually the last element of the ski lift to be designed. They may be wooden or earthen structures. Some newer designs permit a loading or unloading station on the snow without the construction of a ramp.

The wooden ramps are supported by cross timbers resting on small concrete pads. Neither the ramp nor these timbers are firmly attached to or imbedded in the concrete. The wooden ramps can be moved with no great difficulty.

Earthen ramps are constructed by simply raising the elevation of the ground to the proper height. Any required additional earth is obtained by bulldozing or hauling it to the site from a surrounding or nearby area. Due to the cost of moving earth in hilly terrain, the ramps made of hauled earth are relatively expensive.

On their income tax returns for the years in issue, petitioners claimed their respective shares of investment credit for all expenditures incurred by the company and the partnership in constructing and installing ski lifts.

In the notices of deficiency, respondent disallowed the investment credits claimed for petitioners' shares of the amounts expended for the line towers and the loading and unloading ramps. The parties agree that investment credits were properly allowable on the remaining items, including the drive and tension terminals and the sheave assemblies. The following schedule reflects the investment credits here in dispute:

| Year | Towers | Ramps | Total |
|---|---|---|---|
| Amounts expended by Weirick & Co. | | | |
| 1966 | $35,943.20 | $8,985.80 | $44,929.00 |
| Amounts expended by Heavenly Valley | | | |
| 1964 | $44,621.19 | $11,155.30 | $55,776.46 |
| 1965 | 40,102.26 | 10,025.56 | 50,127.82 |
| 1966 | 57,334.70 | 14,333.67 | 71,668.37 |
| 1967 | 40,179.74 | 10,044.94 | 50,224.68 |
| 1968 | 62,136.58 | 15,534.14 | 77,670.72 |

OPINION

The only issue is whether (1) the line (i.e., cable-support and hold-down) towers and (2) the loading and unloading ramps are "section 38 property," as that term is defined in section 48(a)(1), and thus eligible for the investment credit. Petitioners' main contention is that these items of property qualify as "tangible personal property" under section 48(a)(1)(A). Alternatively, petitioners contend that the disputed items are parts of "elevators" within the meaning of section 48(a)(1)(C).[3] Respondent maintains that the towers and ramps are not tangible personal property within the meaning of section 48(a) (1)(A) or elevators within the meaning of section 48(a)(1)(C) but are "inherently permanent structures" for which the credit is not allowable.

The investment credit provided by section 38 is allowed only for "section 38 property," which is defined by section 48(a)[4] to include,

---

[3] Petitioners have abandoned a third theory: That the towers and ramps are "other tangible property" used as an "integral part * * * of furnishing transportation" within the meaning of sec. 48(a)(1)(B). Cf. *Mt. Mansfield Co.*, 50 T.C. 798 (1968), affirmed per curiam 409 F.2d 845 (C.A. 2, 1969).

[4] The text of subpars. (a)(1)(A) and (C) of sec. 48, the portion of the definition of sec. 38 property here in dispute, reads as follows:

SEC. 48. DEFINITIONS; SPECIAL RULES.

(a) SECTION 38 PROPERTY.—

(1) IN GENERAL.—Except as provided in this subsection, the term "section 38 property" means—

(A) tangible personal property, or

\* \* \* \* \* \* \*

(C) elevators and escalators, but only if—

(i) the construction, reconstruction, or erection of the elevator or escalator is completed by the taxpayer after June 30, 1963, or

(ii) the elevator or escalator is acquired after June 30, 1963, and the original use of such elevator or escalator commences with the taxpayer and commences after such date.

among other items, "tangible personal property." Section 1.48–1(c), Income Tax Regs., explains that "the fact that under local law property is held to be personal property or tangible property" does not control the decision as to whether property constitutes "tangible personal property." Rather, that term is given a special meaning tailored to the purposes of the investment credit provisions, stated in part in the cited regulation as follows:

For purposes of this section, the term "tangible personal property" means any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures). * * *

### 1. *The Towers*

Respondent points out that the line towers are sturdily constructed and firmly anchored, either by being bolted to, or sunk into, concrete foundations. Each foundation contains from 6 to 20 cubic yards of concrete, and the towers are designed to last the life of the ski lift. If we had only to decide whether the towers are "inherently permanent structures" in the ordinary sense of that phrase, the problem would be an easy one.[5] They are.

Respondent concedes, however, that the terminal towers, as distinguished from the line towers, are "section 38 property." Considered alone, the terminal towers have as many of the characteristics of permanent structures as the line towers. They are subject to greater stress and, consequently, are of much more substantial construction than the line towers. Obviously, considering the fashion in which they are affixed to the ground and how permanently they are designed to remain in place, it is not possible to treat the line towers as inherently permanent structures without recognizing that the terminal towers have the same character.

Respondent maintains that even though the terminals are, indeed, inherently permanent structures, they are nonetheless "section 38 property" under the following excerpt from section 1.48–1(c) of the regulations:[6] "all property which is in the nature of machinery (other

---

[5] Petitioners offered evidence to show that the towers can be, and on occasion are, moved. We do not think their movability alone is sufficient to warrant our holding that the towers are not inherently permanent structures. In *O. O. Everhart*, 61 T.C. 328 (1973), involving a sewage disposal system, this Court said (p. 331): "While it is true that the tank may be removed, we do not believe that movability per se determines whether property is personal or not." While movability is a factor which should be considered, it is not decisive in the instant case.

[6] Sec. 1.48–1(c), Income Tax Regs., defining "tangible personal property," is as follows: If property is tangible personal property it may qualify as section 38 property irrespective of whether it is used as an integral part of an activity (or constitutes a research or storage facility used in connection with such activity) specified in paragraph (a) of this section. Local law shall not be controlling for purposes of determining whether property

than structural components of a building or other inherently permanent structure) shall be considered tangible personal property even though located outside a building." The terminals, respondent concedes, qualify for the investment credit because they are "property which is in the nature of machinery," and he states in his reply brief that "all property which is in the nature of machinery shall be considered tangible personal property regardless of whether or not it is inherently permanent." [7] In a letter submitted as a supplement to his reply brief, respondent clarified his position in these words:

> It is our position that treating the terminals and towers differently is not inconsistent. Although both the terminals and the towers are inherently permanent, the terminals, unlike the towers, qualify for the investment credit because they are property in the nature of machinery. * * *

Respondent's present interpretation of section 1.48-1(c), Income Tax Regs., is not consistent with the position he took in *Beverly R. Roberts*, 60 T.C. 861 (1973), where he argued on brief that: "Treas. Reg. § 1.48-1(c) defines the meaning of the term 'tangible personal property' and excludes from such classification 'inherently permanent structures', even if in the nature of machinery." In the instant case, however, respondent acknowledges that property *in the nature of machinery* qualifies as tangible personal property, regardless of

___

is or is not "tangible" or "personal". Thus, the fact that under local law property is held to be personal property or tangible property shall not be controlling. Conversely, property may be personal property for purposes of the investment credit even though under local law the property is considered to be a fixture and therefore real property. For purposes of this section, the term "tangible personal property" means any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures). Thus, buildings, swimming pools, paved parking areas, wharves and docks, bridges, and fences are not tangible personal property. Tangible personal property includes all property (other than structural components) which is contained in or attached to a building. Thus, such property as production machinery, printing presses, transportation and office equipment, refrigerators, grocery counters, testing equipment, display racks and shelves, and neon and other signs, which is contained in or attached to a building constitutes tangible personal property for purposes of the credit allowed by section 38. Further, all property which is in the nature of machinery (other than structural components of a building or other inherently permanent structure) shall be considered tangible personal property even though located outside a building. Thus, for example, a gasoline pump, hydraulic car lift, or automatic vending machine, although annexed to the ground, shall be considered tangible personal property.

[7] It will be noted that there is a significant difference in the manner in which the phrase "inherently permanent" structures or structure is used in the two excerpts quoted in the text from sec. 1.48-1(c) of the regulations. The first-quoted sentence refers to "land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures)." The second-quoted excerpt refers to "structural components of a building or other inherently permanent structure." The excerpts from respondent's briefs, quoted in the text, show that he interprets the "structural components" language in the latter extract from the regulations to refer to "structural components of a building" or "structural components of * * * other inherently permanent structure" and to mean that "property in the nature of machinery" is tangible personal property unless it is a structural component of an inherently permanent structure.

whether it is inherently permanent, but contends that the line towers here in dispute are not property in the nature of machinery and that they fail to qualify for the investment credit because they are inherently permanent structures within the meaning of the regulations. The issue before us is thus limited, and the question is the breadth of the phrase "property which is in the nature of machinery" as used in the regulations.

A study of the legislative history of the investment credit provisions shows that they were designed to stimulate the economy by reducing the net cost of acquiring depreciable assets, thereby increasing the cash flow available for investment. S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 716–717. The credit is allowed on a selective basis. It is not allowable for land and improvements thereto, such as buildings and other inherently permanent structures (including items that are structural components of such structures). However, it is allowable for tangible personal property, and that term is not intended to be defined narrowly. Assets, such as machinery, which are accessory to the operation of a business generally constitute tangible personal property eligible for the credit, even though such assets may be considered fixtures under State law. The committee report accompanying the original enactment of the provisions explains that: "The greater emphasis is placed on equipment and machinery because it is believed the need for such investment is the major requirement of the economy." H. Rept. No. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 413.

Given the congressional emphasis on equipment and machinery and a further congressional admonition that "Tangible personal property is not intended to be defined narrowly," H. Rept. No. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 415, and given respondent's concession that inherently permanent structures qualify for the credit if they are in the nature of machinery, we think the line towers also qualify for the investment credit. While the terminal towers have more mechanical paraphernalia on them than the line towers, the sheave assemblies—concededly property in the nature of machinery—and the line towers are so closely related in design, construction, and function that they cannot be treated realistically as two separate groups of assets. Together they are property in the nature of machinery within the meaning of the regulations.

The line towers are designed in light of the amount and character of the stress to be placed on them by the cable reactions through the sheave assemblies. Included in the record is a ski lift design, which the parties agree is representative of the design of the ski lifts here in issue. That design, prepared through the use of a computer analy-

sis, shows the input data consisted of the cable reactions and the line tower properties, and each tower is analyzed separately. The average minimum and maximum sheave loads, column response, maximum soil pressure, and factors of safety against overturning are determined for critical loading conditions. The loading conditions taken into account include minimum operating loading conditions (i.e., empty chairs and no wind or icing), maximum operating loading conditions (i.e., all chairs fully loaded and a 35-mile-per-hour wind velocity), nonoperating loading conditions based upon a 90-mile-per-hour wind velocity, and nonoperating loading conditions based upon a 35-mile-per-hour wind velocity with heavy icing. Thus, the line towers and the sheave assemblies are designed as a unitary mechanism.

The towers and the sheave assemblies, in accordance with the design, are also constructed as units. They are not isolated properties. According to the testimony, a State inspector recently required one ski lift operator to replace the sheave assemblies on the line towers of two of its lifts. New crossarms and sheave assemblies were placed on the existing towers at one of the lifts. However, the engineers found it easier and just as economical to replace the towers at the other lift. Accordingly, instead of installing new sheave assemblies on the old towers at the second lift, the operator replaced nine towers and their related crossarms and sheave assemblies.

From a functional standpoint, moreover, the towers are almost inseparable from the sheave assemblies. Together the towers and the sheave assemblies support or hold down the cables to which the moving chairs are attached. Neither the towers nor the sheave assemblies alone could perform this function. The number of the sheaves and the number of the towers are related. Since the load capacity of each sheave is limited and the number of sheaves per tower is limited, it is often necessary to erect more than one tower at a site of heavy stress in order to support the needed sheave assemblies. The only purpose of the towers is to serve as a support for the sheave assemblies, elevating them or lowering them to the desired height. Indeed, it is stipulated that: "A cable support or hold down tower * * * has no substantial economic purpose other than for use as part of a ski lift."

Based on an examination of the entire record, as well as our personal inspection of some of the property in question, we think respondent's classification of the towers as a separate group of assets was erroneous. A line tower and its sheave assembly are a unitary mechanism. Accordingly, we hold that the line towers are tangible personal property within the meaning of section 48(a)(1)(A) and qualify for the investment credit.[8]

---

[8] Cf. Rev. Rul. 69–169, 1969–1 C.B. 27; see *Estate of Shirley Morgan*, 52 T.C. 478, 484 (1969), affirmed per curiam 448 F.2d 1397 (C.A. 9, 1971).

## 2. *The Ramps*

Petitioners urge us to view the entire ski lift as a unitary asset in the nature of machinery and, on this theory, to hold that the ramps, as well as the towers, qualify for the investment credit. Although we recognize the merit in petitioners' argument that the ski lift should be viewed as a whole, we prefer to rest our decision on the narrower grounds stated above.

However, even if we should adopt petitioners' theory that the ski lift should be viewed as one unitary mechanism, this would not cause the ramps to qualify for the investment credit as they are not property in the nature of machinery. The ski lift machinery would operate in exactly the same way regardless of whether the ramps were ever constructed. While the ramps are helpful, or even necessary, to persons using the ski lift, the ramps are not involved in the mechanical operation of the lift.

We agree with respondent that the earthen ramps are inherently permanent structures which do not qualify for the credit. As stated in our Findings, these earthen ramps are merely mounds of dirt that have either been bulldozed or hauled to the site from surrounding or nearby areas. Because of the expense involved in moving the dirt, the ramps ordinarily will remain at that site, even if the ski lift is eventually moved. It is difficult to imagine any item of property that would fit more accurately the description contained in the regulations of property that does not constitute tangible personal property, i.e., "land and improvements thereto, such as * * * inherently permanent structures."

As to the wooden ramps, however, we think a different result is indicated. They are not imbedded in or firmly attached to the concrete pads on which they stand. They merely rest on the pads, and they could be moved with no great difficulty. Like the relevant assets in *Estate of Shirley Morgan,* 52 T.C. 478, 482–483 (1969), affirmed per curiam 448 F. 2d 1397 (C.A. 9, 1971) (floating docks held in place by pilings), and *Joseph Henry Moore,* 58 T.C. 1045, 1052–1053 (1972), affirmed per curiam 489 F. 2d 285 (C.A. 5, 1973) (trailers resting on concrete blocks), these ramps are not inherently permanent structures. Accordingly, they qualify as tangible personal property.

Petitioners' remaining argument is that the amounts spent for all the ramps (as well as for the towers) qualify under section 48(a) (1) (C) for the investment credit because a ski lift is an elevator. We disagree.

The legislative history of section 48(a) (1) (C) clearly shows that the provision was enacted as an amendment to the original investment credit provisions to allow elevators and escalators used in a building to

qualify as section 38 property, even though the regulations (sec. 1.48-1 (e)(2), Income Tax Regs.) otherwise would classify them as non-qualifying structural components of a building. H. Rept. No. 749, 88th Cong., 1st Sess. (1963), 1964-1 C.B. (Part 2) 159-160, 162; S. Rept. No. 830, 88th Cong., 2d Sess. (1964), 1964-1 C.B. (Part 2) 545-546, 548. Except for that limited purpose, the provision was not intended to extend the definition of what constitutes "section 38 property." Since neither the ski lift as a whole nor the ramps fit within that exception, i.e., structural components of a building, they do not qualify under section 48(a)(1)(C) for the investment credit.

Accordingly,

*Decisions will be entered under Rule 155.*