JOSEPH C. SILER AND SHIRLEY A. SILER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; WILFORD A. BUHR AND CLARA E. BUHR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Siler v. Commissioner
Docket Nos. 24594-83, 24973-83.*
United States Tax Court
T.C. Memo 1985-257; 1985 Tax Ct. Memo LEXIS 376; 49 T.C.M. (CCH) 1587; T.C.M. (RIA) 85257; May 29, 1985. Richard E. Aikman,Joe C. Emerson, and Theodore J. Esping, for the petitioners in docket No. 24594-83. Stephen K. Miller and Judith J. Woddell, for the petitioners in docket No. 24973-83. Rodney J. Bartlett, for the respondent. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Petitioner
Docket No.
Year
Deficiency
Joseph C. Siler &
24594-83
1975
$ 6,498.79
Shirley A. Siler
1978
$ 5,496.12
1979
$11,001.04
1980
$ 3,349.73
Wilford A. Buhr &
24973-83
1978
$10,136.88
Clara E. Buhr
1979
$ 2,566.34
*378 After concessions, the issue for decision is whether certain assets sold by the Buhrs and their wholly owned corporation to Joseph Siler in 1978 are to be characterized as "tangible personal property" within the meaning of section 48(a)(1)(A)[1] and "personal property" within the meaning of section 1245(a)(3)(A). Characterizing any or all of these assets as personal property will benefit Siler to the detriment of the Buhrs. Respondent is essentially in the posture of a stakeholder and has taken contrasting positions in each case to avoid being whipsawed. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners Joseph C. Siler ("Siler") and his wife, Shirley A. Siler, resided in Washington, Indiana at the time they filed their petition, as did petitioners Wilford A. Buhr ("Buhr") and his wife, Clara E. Buhr. At the outset, to facilitate an understanding of these consolidated cases, we shall briefly outline the operative facts and *379 describe the problems which we are asked to resolve. In 1978, Siler purchased from the Buhrs and Bud Buhr, Inc., (an Indiana corporation wholly owned by the Buhrs) the assets of a bulk petroleum distribution and retail establishment. The assets that Siler purchased included several large storage tanks located on the business premises (the bulk plant), a complex of pipes and pumps (the loading rack assembly) located at the bulk plant, and numerous smaller tanks (the customer service tanks) located on the premises of customers. [2] The contract of sale itemized, and allocated a portion of the purchase price to, each of the assets sold. Among the assets sold were four items, designated as storage tanks, bulk tanks, bulk plant tanks, and bulk plant pumps, each having been acquired by the Buhrs in 1975. Our initial problem involves matching the contract designation of these four items to the actual assets sold. The Buhrs claim that the contract items "bulk plant tanks", "bulk tanks" and "storage tanks" all refer to the large tanks located at the bulk plant and that "bulk plant pumps" refers to the loading rack assembly. The Silers, on the other hand, assert that only the contract term *380 "bulk plant tanks" refers to the large tanks located at the bulk plant, that the contract term "bulk plant pumps" refers to the loading rack assembly, and that the two contract terms "bulk tanks" and "storage tanks" refer to the customer service tanks. Once having matched the assets sold to the contract designation given to each, we then must determine which, if any of these assets, are personal property. This, in turn, will determine the availability to the Silers of the investment tax credit for their investment in these assets and the correlative reguirement that the Buhrs recapture depreciation previously claimed with respect to the assets. The facts, in greater detail, follow: Between the years 1957 and 1975, Buhr managed a petroleum bulk storage plant for Amoco in Washington, Indiana. Amoco delivered bulk quantities of petroleum products to the bulk plant where such products were stored in six large cylindrical storage tanks, ranging in capacity from 11,500 gallons to 17,500 gallons. Each storage tank weighed between six and eight tons when empty, *381 and was positioned horizontally on three or four steel-reinforced concrete or brick piers. The piers were approximately ten feet in length, extended from 30 inches below ground to seven and one-half feet above ground, were seven feet wide and 12 to 13 inches thick at the bottom.The storage tanks were cradled in the U-shaped top of the piers on a one-half inch layer of rubber or asphalt. Aside from the storage tanks' sheer weight, there was no actual affixation of the tanks to the piers. Each pier/tank unit was connected by a complex of aboveground and underground pipes and pumps to a metered loading rack (the loading rack assembly) through which delivery trucks would be driven and loaded. The tanks and loading rack had not been moved since at least 1951. In addition to serving as manager of the Amoco bulk plant, Buhr operated his own business whereby he purchased petroleum products from the bulk plant and sold them to local farmers and others. As a service to his customers and to maintain his competitiveness, Buhr supplied his customers with service tanks (ranging in size from 150 gallon capacity to 1,000 gallons capacity) which were kept at the premises of the customers. The *382 Buhrs personally purchased these tanks periodically since the early 1960's. In April, 1975, they purchased additional tanks for $28,967.20. [3] Approximately five to six of these tanks were moved each month during the non-winter months, and somewhere between three and five tanks were removed each month as customers discontinued service. Bud Buhr, Inc. was organized in January, 1975, as an Indiana corporation. It initially engaged in the business of selling agricultural chemicals and herbicides. In February, 1975, it elected to operate as a small business corporation under Subchapter S of the Internal Revenue Code of 1954, with a taxable year ending January 31. On October 21, 1975, the Buhrs purchased the assets of the bulk plant from Amoco. These assets included the large storage tanks, the loading rack assembly, buildings, trucks, and assorted other assets. The Buhrs subsequently transferred all these newly acquired assets to Bud Buhr, Inc. except for the large storage tanks and the loading rack assembly, which they retained personally. *383 As a result, the Buhrs personally owned the large storage tanks, the loading rack assembly, and all the customer service tanks (including those customer services tanks acquired in April, 1975, for $28,967.20). On their depreciation schedule, the Buhrs calculated depreciation deductions with an adjusted basis for storage tanks of $13,860.52, for bulk tanks of $15,106.70, for bulk plant tanks of $13,420, and for bulk plant pumps of $1,400, or a total cost basis of $43,787.22. [4] These refer to the large storage tanks, the loading rack assembly, and the customer service tanks acquired in 1975. During 1976, Bud Buhr, Inc. acquired and installed at the bulk plant location a new *384 17,800 gallon vertical storage tank. This new tank sat atop a one and one-half foot deep gravel bed. On November 9, 1978, following negotiations during which the Buhrs and Siler were each represented by counsel, the Buhrs, Bud Buhr, Inc., and Siler entered into a purchase agreement in accordance with which Siler purchased for $185,000 those assets owned by Bud Buhr, Inc. and the storage tanks, bulk tanks, bulk plant tanks, and bulk plant pumps owned personally by the Buhrs. The agreement was drafted by Siler's attorney. Attached to, and incorporated into, the agreement was a list of equipment that was included in the sale. Each item was listed along with its year of acquisition and the portion of the $185,000 purchase price that was allocated thereto. In a letter to Buhr accompanying the proposed purchase agreement, Siler stated, inter alia, that "the list of equipment shows depressed prices of everything except the Bulk Plant Equipment." The consequence, he explained in the letter, was "the capital gain treatment you [Buhr] will get by avoiding a great deal of depreciation recapture." The customer service tanks acquired in 1975, the large storage tanks and the loading rack *385 assembly, all owned by the Buhrs individually, were allocated $124,738 of the total $185,000 purchase price, as follows: Unit
Year of Acquisition
Purchase Price
Bulk Plant Pumps
1975
$29,500
Bulk Plant Tanks
1975
30,000
Bulk Tanks
1975
35,238
Storage Tanks
1975
30,000
In addition, tanks and pumps, representing a total of $7,373 of the purchase price, were listed as follows: Unit
Year of Acquisition
Purchase Price
Bulk Storage Tanks
1965
$100
Pumps-Tanks
1966
50
Pumps-Tanks
1967
10
Pumps-Tanks
1968
10
Pumps-Tanks-Meters
1969
1
Tanks-Equipment
1971
2
Storage Tanks
1974
400
Pumps & Tanks
1976
3,000
Farm Tanks
1977
3,000
Station Tank/Pumps
1977
800
The items shown with acquisition dates prior to 1975 refer to the tanks and ancillary equipment purchased and owned by the Buhrs personally during Buhr's tenure as the manager of the Amoco bulk plant. The "pumps & tanks" shown as having been acquired in 1976 refers to the 17,800 gallon vertical tank. Siler operated the business as a sole proprietorship until April 1, 1980, at which time it was incorporated as the Siler Oil Company, Inc. In the Silers' *386 1978 income tax return, they claimed an investment tax credit for the entire purchase price, limited by the $100,000 maximum qualified investment allowed under section 48(c) for "Used Section 38 Property". They thus had available a total investment tax credit of $10,000, of which they could use only $3,381 in 1978. Of the remaining $6,619, $6,520 was carried back to 1975, and $99 was carried back to 1976. In addition, their tax return for 1978 showed $184,000 as the depreciable basis for property acquired in 1978. Of this sum, $88,738 is for "Buildings", and $69,562 is for "Machinery and Equipment." There are identical entries on their 1979 and 1980 tax returns, but attached to these returns are depreciation schedules that include "Bulk Plant Pumps" and "Bulk Tanks" (with cost bases of $29,500 and $35,238, respectively) in the category of Real Estate Improvements, while Storage Tanks and Bulk Plant Tanks (each with a basis of $30,000) are included in the category denominated as Machinery and Equipment. In the Buhrs' 1978 income tax return, they recaptured no depreciation, but a portion of the investment tax credit they claimed in 1975 was recaptured. See note 4, supra.
*387 Respondent sent notices of deficiency to both the Silers and the Buhrs taking opposite positions. With regard to the Silers, respondent took the position that none of the four items listed as bulk plant pumps, bulk plant tanks, bulk tanks, and storage tanks was section 38 property, and therefore the Silers were not entitled to an investment tax credit for the portion of the purchase price allocated to them. With respect to the Buhrs, respondent took the position that the Buhrs were liable for depreciation recapture on the basis that the four items were section 1245 property. ULTIMATE FINDINGS OF FACT The items referred to in the contract of sale as bulk plant tanks and bulk plant pumps are the six large storage tanks and the loading rack assembly, respectively. Those items referred to in the contract of sale as bulk tanks and storage tanks are the customer service tanks purchased by the Buhrs in 1975. OPINION These consolidated cases involve the characterization of four items designated in the purchase agreement as "bulk plant pumps", "bulk plant tanks", "bulk tanks", and "storage tanks". Those items characterized as qualifying for the investment tax credit by Siler (the *388 purchaser) will be treated as items which are subject to depreciation recapture by the Buhrs (the sellers). This is because property on which an investment tax credit (ITC) may be claimed upon its acquisition (section 38 property [5]) is defined in essentially the same terms as is property for which depreciation must be recaptured upon its sale (section 1245 property [6]). In other words, when an asset is characterized for the buyer as section 38 property, it generally will be characterized as section 1245 property for the seller. Accordingly, petitioners Buhrs and Silers have conflicting interests; a characterization that benefits one results in a tax detriment for the other. This conflicting interest has been recognized as sufficient reason to respect the parties' arm's length allocation of the purchase price among assets. Sec. 1.1245-1(a)(5), Income Tax Regs. We therefore will honor the allocation of the purchase price to the four items at issue as set forth in the purchase agreement. *389 Initially, we must decide what is actually meant by the contractual designation of "bulk plant tanks," "bulk tanks," "storage tanks" and "bulk plant pumps." The Buhrs claim that all four items refer to the large storage tanks and loading rack assembly located at the bulk plant. They argue that all four items should be characterized as property not subject to depreciation recapture, i.e., not section 1245 property. As a result, if the Buhrs' characterization is adopted, Siler may claim no ITC for any part of the purchase price allocated to the four items. On the other hand, Siler asserts that the terms "storage tanks" and "bulk tanks" refer to the customer service tanks, while the terms "bulk plant tanks" and "bulk plant pumps" refer to the large storage tanks and loading rack assembly located at the bulk plant. He argues that the customer service tanks, the large storage tanks, and the loading rack complex all fit within the definition of section 38 property and therefore qualify for the ITC. That, in turn, means that the Buhrs must recapture the depreciation deductions they had claimed, up to the amount of their gain, on thos items. We recognize the difference in treatment *390 each of the petitioners would receive depending on which characterization we adopt and the conflict it engenders between them; it is therefore no surprise that the Buhrs and the Silers propose findings of fact and advance legal arguments inconsistent with each other. However, while inconsistencies between the parties are understandable, each petitioner has taken a position during this litigation entirely inconsistent with the actions he has taken prior to this proceeding. For instance, the Buhrs insist that the four items denominated as "bulk plant pumps", "bulk plant tanks", "bulk tanks", and "storage tanks", acquired by them in 1975 and sold to Siler in 1978, are not section 1245 property. This would mean such items are not section 38 property. However, the Buhrs claimed an ITC for these items in their income tax return for 1975. [7]
*391 On the other hand, the Silers, while insisting that the term "bulk tanks" refers to customer service tanks, listed bulk tanks (with a basis of $35,238) as "Real Estate Improvements" and "Buildings" on their income tax returns covering 1978 through 1980. They fail to explain how bulk tanks, which they claim to be customer service tanks located on customer premises, could also be considered improvements to their real estate. In addition, they characterized the bulk plant pumps as real estate improvements (which do not qualify as section 38 property) on their depreciation schedule, and yet claim an ITC for them herein. Turning then to the maze-like record before us, we confront the not insubstantial task of attaching the labels "bulk plant pumps," "bulk plant tanks," "bulk tanks," and "storage tanks" to particular assets in the pool of assets sold by the Buhrs to Siler. The pool of assets sold by the Buhrs and Bud Buhr, Inc. to Siler included six large horizontal storage tanks located at the bulk plant and acquired by the Buhrs from Amoco in 1975, one 17,800 gallon vertical storage tank also located at the bulk plant (but acquired by the Bud Buhr, Inc. in 1976), numerous smaller *392 customer service tanks [8] called by various names (such as overhead tank, skid tank, underground tank, and H.O. tank), and electric pumps attached to a network of underground and aboveground pipes, valves and meters, all part of the loading rack at the bulk plant. *393 It is obvious that none of the four listed items refer to the 17,800 gallon vertical tank, as all of the items included in the categories "bulk tanks", "bulk storage tanks", and "storage tanks" were acquired in 1975, whereas the vertical tank was acquired in 1976. That leaves the six horizontal tanks which, although varying in size from 11,500 gallons to 17,500 gallons, are virtually identical in structure and use. Since these six tanks are located at the bulk plant, the term "bulk plant tanks" seems to be the appropriate label. We do not believe the terms "bulk tanks" and "storage tanks" refer to the same tanks covered by the term "bulk plant tanks", since it is unlikely that six virtually identical tanks would be referred to by three different terms (bulk plant tanks, bulk tanks, and storage tanks). Likewise the term "bulk plant pumps" (as used in the contract of sale) apparently refers to the loading rack assembly (pumps, meters, valves, and pipes) located at the bulk plant. It follows that the customer service tanks are described by the terms "bulk tanks" and "storage tanks". It is more likely than not that these tanks, differing in function and ranging in size from 150 *394 gallon capacity to 1000 gallon capacity, could be divided into two basic groupings, namely bulk tanks and storage tanks. Furthermore, Buhr testified that he purchased $30,000 worth of customer service tanks (be they denoted as farm tanks or otherwise) in 1975 for his own account. Although far from clear, it would appear that the $30,000 worth of tanks Buhr testified to having purchased in 1975 are the "bulk tanks" and "storage tanks" for which he had a basis, according to his depreciation schedule, of $15,106.70 and $13,860.52, respectively (total cost basis of $28,967.22). [9]
Having decided that (1) the contract designation "bulk plant tanks" refer to the six horizontal tanks (with a stated purchase price of $30,000), (2) the contract designation "bulk plant pumps" refer to the pumps, meters, valves, and piping that comprise the loading rack assembly (price of $29,500), and (3) the contract *395 designations "bulk tanks" and "storage tanks" refer to the customer service tanks (total price of $65,238), we next must decide which, if any, of these items are section 38 and section 1245 property. Siler concedes that none of the items at issue fit within the definition of section 38 property for purposes of section 48(a)(1)(B), (C), (D), or (E). Instead, he contends that all of the tanks and pumps are "tangible personal property" within the meaning of section 48(a)(1)(A). See also sec. 1245(a)(3)(A). The Treasury regulations, which provide that local law definitions of tangible personal property are not controlling, define tangible personal property as "any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures)." Sec. 1.48-1(c), Income Tax Regs.
None of the parties contend that the bulk tanks and storage tanks are buildings; nor did any of them argue that such tanks constitute any other type of inherently permanent *396 structure. Indeed, respondent has permitted the Silers to claim an ITC for the customer service tanks (those acquired by the Buhrs in years other than 1975) which were itemized on the purchase agreement. This treatment comports with Rev. Rul. 69-602, 1969-2 C.B. 6, wherein respondent authorized an ITC for propane gas customer storage tanks on the grounds that those tanks (which in all material respects are identical to those with which we are concerned here) were tangible personal property. Thus, respondent's denial to Siler of an ITC for his investment in these tanks cannot be sustained. Analogously, the bulk tanks and storage tanks are personal property ( sec. 1.1245-3(b)(1), Income Tax Regs.) for which the Buhrs must recapture previously deducted depreciation upon disposition, pursuant to section 1245. The answer is not so clear, however, with respect to the bulk plant tanks. The Buhrs and respondent argue that we should consider each bulk plant tank as a single unit integrated with its piers when deciding if the tanks are tangible personal property. Viewing the tanks and piers this way, they conclude that the tanks cannot be considered *397 presonal property but instead as inherently permanent structures. Siler, on the other hand, would have us examine the tanks separate from the piers; he argues that an examination such as he propounds would lead to the conclusion that the tanks are in fact tangible personal property. The same characterization conflict surrounds the bulk plant pumps. In Standard Oil Co. (Indiana) v. Commissioner,77 T.C. 349, 404-409 (1981), we analyzed each component part of a gas station sign to decide whether those component parts were tangible personal property. As a preliminary step, the component parts had to be identified. To that end, we had to decide which parts of the sign were items independent unto themselves and which parts were simply components of an integrated unit that itself represented a single item. In that case, we found the sign atop the pole to be an independent item, separate from the pole and concrete base that comprised the rest of the sign assembly, for purposes of analysis. Where the poles were sunk into the concrete base, we held the poles and the bases to be integrated units; where the poles were simply bolted to the concrete base, the poles and the *398 bases were held to be independent from the base. In that same vein, in the instant case, we must identify the component parts of the bulk plant tank assembly and the bulk plant pump assembly, in order to determine if any part, or all, of either item constitutes tangible personal property. The tanks and piers are analogous to the sign poles in Standard Oil which were sunk into their concrete base. Empty, each tank weighs six to eight tons. While they are not mechanically affixed to the piers, their sheer weight and girth made any such attachment unnecessary and redundant. [10] Therefore, the tanks and piers are to be analyzed as integrated units to determine whether they are tangible personal property for the purposes of section 38 and section 1245.
*399 Excluded from the definition of section 38 or section 1245 property are inherently permanent structures. That the tank/pier units are affixed to the ground does not mean that they are, ipso facto, inherently permanent structures.In Whiteco Industries Inc. v. Commissioner,65 T.C. 664 (1975), we were faced with the question of whether certain billboards which were affixed to the ground by poles were to be considered inherently permanent structures. We developed a test that essentially inquired into the manner of affixation of the unit (whether it was intended to be, or was in fact, placed permanently), whether it was capable of being moved and, if movable, the degree of damage it would sustain upon removal. It is clear, in applying the Whiteco Industries analysis to the tank/pier units involved herein, that the units are indeed inherently permanent structures. The tank/pier units cannot be moved; the piers were built where they stand, two and one-half feet deep into the ground. Removal had never been contemplated, as is evident by the construction and design of the units. Demolition being the only way to remove them, the piers would have been reduced to *400 rubble had removal been attempted. Thus, we believe that the bulk plant tanks (as an integral part of a tank/pier unit) are not personal property, but instead are inherently permanent structures. As such, they are neither section 38 nor section 1245 property. We also hold the bulk plant pumps to be an integrated unit which is an inherently permanent structure. The evidence and testimony regarding this matter, although minimal, [11] establishes that the bulk plant pumps (i.e. loading rack assembly) are a network of aboveground and underground pipes, pump, meters and valves that have never been moved and that were never intended to be moved. The bulk plant pumps are therefore neither section 38 nor section 1245 property. To summarize, the Silers may claim an ITC under section 48 based only on an investment of $65,238 for the bulk tanks and storage tanks while the Buhrs must recapture, under section 1245, the depreciation deductions they claimed on the bulk tanks and storage tanks (total cost basis of $28,967.22) to *401 the extent of their gain. Accordingly, Decision will be entered under Rule 155.
Footnotes
*. By order of this Court dated July 7, 1984, these cases have been consolidated for purposes of trial, briefing and opinion.↩
1. All section references are to the Internal Revenue Code of 1954, as amended, and in effect, during the years at issue.↩
2. The contract of sale did not indicate which assets were owned by the Buhrs and which were owned by their corporation.↩
3. Buhr testified that he purchased $30,000 worth of customer service tanks in 1975, whether they were called farm tanks or otherwise.↩
4. When the Buhrs and Bud Buhr, Inc. sold the assets to Siler in 1978, the Buhrs recaptured $2,919.29 of a $4,378.72 investment tax credit (claimed in 1975) for an asset identified on their 1978 income tax return as "Bulk Tanks" and for which was shown a cost basis of $43,787.22. The Bhurs thus claimed an investment tax credit for their purchase of the customer service tanks in April, 1975, and for their purchase from Amoco in October 21, 1975, of the bulk plant assets which were personally retained.↩
5. For property placed in service before October 1, 1978, section 48(a)(1) defines section 38 property as generally: (A) tangible personal property, or (B) other tangible personal property (not including a building and its structural components) but only if such property-- (i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or (ii) constitutes a research facility used in connection with any of the activities referred to in clause (i), or (iii) constitutes a facility used in connection with any of the activities referred to in clause (i) for the bulk storage of fungible commodities (including commodities in a liquid or gaseous state), or (C) elevators and escalators, but only if-- (i) the construction, reconstruction, or erection of the elevator or escalator is completed by the taxpayer after June 30, 1963, or (ii) the elevator or escalator is acquired after June 30, 1963, and the original use of such elevator or escalator commences with the taxpayer and commences after such date. Such term includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 3 years or more. ↩
6. Section 1245 property is defined in section 1245(a)(3) as follows: (3) SECTION 1245 PROPERTY.--For purposes of this section, the term "section 1245 property" means any property which is or has been property of a character subject to the allowance for depreciation provided in section 167 (or subject to the allowance of amortization provided in section 185) and is either-- (A) personal property, (B) other property (not including a building or its structural components) but only if such other property is tangible and has an adjusted basis in which there are reflected adjustments described in paragraph (2) for a period in which such property (or other property)-- (i) was used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or (ii) constituted a research facility used in connection with any of the activities referred to in clause (i), or (iii) constituted a facility used in connection with any of the activities referred to in clause (i) for the bulk storage of fungible commodities (including commodities in a liquid or gaseous state), (C) an elevator or an escalator, or (D) so much of any real property (other than any property described in subparagraph (B)) which has an adjusted basis in which there are reflected adjustments for amortization under section 169, 185, 188, or 190↩.
7. There was no testimony in this regard nor was the Buhrs 1975 income return in evidence. However, a comparison of the Buhrs' 1978 income tax return, their individual depreciation schedule, and the purchase agreement uncovers the Buhrs' actions. The 1978 purchase agreement shows the four items at issue to be the only tanks and pumps purchased by the Buhrs in 1975. These items were kept by them rather than transferred to the corporation, and therefore, they claimed depreciation deductions for them on their individual tax return. On their depreciation schedule, the cumulative cost basis for the storage tanks, bulk tanks, bulk plant tanks, and bulk plant pumps, acquired in 1975, was $43,787.22. Their 1978 income tax return reflects a recapture of an ITC claimed in 1975 for "Bulk Tanks" with a cost basis of $43,787.22. It is obvious that these "Bulk Tanks" for which an ITC was taken in 1975 by the Buhrs are the four items at the center of this controversy--assets which the Buhrs now claim not to be section 38 property.↩
8. The buhrs objected at trial (on the basis of the parol evidence rule) to the admission into evidence of a list compiled by them and presented to Siler of customers to whom oil deliveries were made. The list included the type and size of tanks and pumps in the possession of each customer, as well as dollar amounts. This list was compiled on September 15, 1976, and revised on June 9, 1977. The contract of sale was entered into on November 9, 1977. The contract of sale was entered Buhrs assert that the list was extrinsic evidence offered to alter the contract of sale, without a showing of fraud or mistake, and therefore is not admissible. In Estate of Craft v. Commissioner,68 T.C. 249, 260-263 (1977), affd. per curiam 608 F.2d 240 (5th Cir. 1979), we discussed at length, two approaches this Court has taken regarding the parol evidence rule when either the respondent or petitioner has objected to extrinsic evidence offered by the other. One line of cases has applied the "third-party to the instrument rule", by which we have admitted parol or extrinsic evidence in relation to a written instrument (such as a contract) because the respondent was not a party to the instrument involved. The rejection of the parol evidence rule in such a situation is based on the theory that, in the area of taxation, administrators and the courts are concerned more with substance than with form. On the other hand, there is a separate line of cases (such as those involving the construction of a will or trust) in which we have looked to, and followed, the applicable State law regarding the admissibility of extrinsic evidence. In the instant case, there is a question as to whether the Buhrs have standing to object to the admissibility of the list by the Silers since technically the dispute involving the Silers is with the Commissioner and not the Buhrs. But we need not decide the question as to standing since the list offered by the Silers would be admissible evidence under either the "third-party to the instrument rule" or applicable State (Indiana) law. Under the former, the objection must be raised by the respondent and he has not done so in this case. Under Indiana law, we would admit the list since it was proffered to adi us in interpreting an ambiguous contract term, rather than to alter the contract. See Old First National Bank & Trust Co. v. Scheuman,214 Ind. 652, 13 N.E. 2d 551 (1938). The Buhrs' objection is therefore overruled. The list, however, although intended to clarify ambiguous terms, provides no such aid. We are not told what the dollar figures represent. The figures could represent, inter alia, the adjusted basis of the tanks and pumps, the value of the tanks and pumps, a deposit on account from each customer, or an account receivable. Thus, the list is an exhibit of no interpretative value to us.↩
9. We believe the $30,000 mentioned by Buhr refers not to the $30,000 allocated in the contract for the storage tanks or the $35,238 for the bulk tanks (which are irrelevant for purposes of characterizing the assets the Buhrs sold to Siler) but instead to the Buhrs' cost for those assets.↩
10. We find Weirick v. Commissioner,62 T.C. 446 (1974) and Moore v. Commissioner,58 T.C. 1045 (1972), affd. per curiam 489 F.2d 285 (5th Cir. 1973), to be distinguishable from the instant case. Although in both of those cases the items in question were not affixed to their bases, the items were easily movable, apart from their bases, and, in Moore,↩ had been moved. In the instant case, there was never an intention to move the tanks; they had never been moved; and moving them could be done only with great expense and difficulty.
11. Neither the Buhrs or the Silers expended much energy in dealing with this matter; but the Buhrs sustained their burden of proof, while the Silers did not.↩