DES MOINES COLD STORAGE CO., INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Des Moines Cold Storage Co. v. Commissioner
Docket No. 26601-83.
United States Tax Court
T.C. Memo 1988-241; 1988 Tax Ct. Memo LEXIS 263; 55 T.C.M. (CCH) 980; T.C.M. (RIA) 88241; May 26, 1988; As amended May 27, 1988 Carlton T. King, for the petitioner. Mark E. O'Leary, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined the following *264 deficiencies in petitioner's Federal corporate income taxes: Year Ended
Deficiency
December 31, 1976
[1] $ 75,777
December 31, 1979
92, 806
This issue for decision is whether petitioner is entitled to investment tax credits ("ITC") under section 38 [2] with respect to a cold storage and freezing facility placed in service by petitioner in 1979 greater than the amount allowed by respondent. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this *265 reference. Petitioner, an Iowa corporation with its principal place of business in Des Moines, Iowa, filed timely corporate income tax returns on the calendar year basis for 176 and 1979. During these years, petitioner was in the business of operating cold storage facilities for the receiving, freezing, storing, and shipping of perishable food products. It also performed other services to a smaller degree. During the years in issue, petitioner received various products from its customers and charged a fee based upon the amount of product received and the duration of time the products were in its possession. Products received by petitioner were primarily the excess of what its customers were able to accumulate and process at their own facilities. Description of the East Property
Petitioner operated its business at four facilities located at three addressed in the Des Moines, Fort Dodge, and Mason City, Iowa, metropolitan areas. Throughout the years, as petitioner's business grew, it built additional refrigerated warehouses to accommodate the increase in business. On or about April 1, 1979, petitioner placed in service in Des Moines, Iowa, a newly constructed 72,100 *266 square foot cold storage facility ("the East Property"). The East Property consists of the following general areas: (a) A rectangular freezer area ("the freezer") with approximate dimensions of 280 feet long by 200 feet wide by 25 feet high, or containing approximately 56,762 square feet. Included in the freezer in the southeast corner is a blast freezer area ("the blast freezer") with approximate dimensions of 35 feet by 67 feet, or containing approximately 2,400 square feet, and segregated from the remainder of the freezer by hanging pieces of corrugated steel attached to the ceiling and intertwined to create a separate area. The blast freezer is divided into two halves by a wall. The blast freezer forces extremely cold air having a temperature of minus 15 degrees Fahrenheit over the products at a high velocity. The freezer is normally maintained at a temperature between minus 17 degrees and minus 19 degrees Fahrenheit. Access to the freezer from the truck dock is accomplished by two automatic six feet by ten feet freezer doors. The freezer is constructed of a steel I-beam roof and steel frames. The roof is flat with a one degree vertical to a sixteen-degree horizontal slope. *267 The floor of the freezer is concrete. A vapor barrier on the walls, ceiling, and floor prevents the cold temperatures maintained in the freezer from drawing moisture out of the ground which would eventually destroy the walls or concrete slab. The walls of the freezer are constructed of steel panels. Each panel consists of a steel shell on the outside which is painted with United States Department of Agriculture ("USDA") approved paint, five inches of polyurathane foamed into the cavity, and, on the inside, another steel shell painted with USDA approved paint. The panels are 44 inches wide and their length varies from approximately 24 to 27 feet. The panels are sealed together and, where the joints are sealed, are caulked so that moisture or air cannot penetrate. Panels also are placed around the perimeter of the ceiling. The purpose of the panels is to prevent heat and moisture vapor penetration. Heat is induced under the floor of the freezer to prevent frost penetration of the floor resulting from the extreme temperatures under which the freezer operates. For this purpose, a heat exchanger located in the engine room captures the exhaust heat from the refrigeration equipment. *268 In addition, to prevent the penetration of frost into the ground, the floor contains a glycohol system which circulates glycohol to a heat exchanger which is thermostatically controlled to maintain a warm underfloor temperature. Starting from structural fill, the floor consists of five grids of three-fourth inch PVC pipe n five-foot centers under the entire floor. These grids are buried in two to three inches of grout or concrete to give a warm subslab. On top of this subslab is five inches of noncrushable, high density insulation covered by a six-inch reinforced wearing slab. Five rows of bins are located in the freezer. Each row contains from 49 to 69 bins capable of storing up to three pallets deep and four pallets high of products within its shelves (i.e., 12 pallets per bin). Three of the principal aisles also are used for storage with pallets placed on the floor. (b) A 72 feet by 16 feet cooler area ("the cooler"). The cooler has insulated walls and is immediately north of the railroad dock and west of the freezer. A conventional wall separates the cooler from the railroad dock. The cooler can be entered by a refrigerator door from the railroad dock. The cooler also *269 has an eight feet by eight feet overhead door which permits access to the cooler from the railroad spur. The purpose of the cooler is to hold products overnight, if necessary, before they are taken into the freezer. (c) An enclosed truck dock area ("the truck dock"). The floor of the truck dock is a six-inch slab reinforced with iron and has drains throughout so that it can be washed and scrubbed. The freezer wall forms one wall of the dock and the outside walls are concrete block. The roof is supported by steel bar joists and then steel decking; it has two inches of polystyrene insulation and a loosely laid membrane roof. The truck dock has ten overhead sliding doors, each with approximate dimensions of seven feet by ten feet, on the south side and a conventional door to the outside near the west end. The truck dock is immediately adjacent to the freezer on the south. The truck dock runs nearly the length of the freezer and abuts the inspection room and maintenance shop. On the east end of the truck dock are two conventional doors into the inspection room and a maintenance shop. Also located on the truck dock are a scale and a small office approximately 11 feet by nine *270 feet. (d) An enclosed railroad dock area ("the railroad dock"). The floor is the same as the truck dock and the walls are concrete block. The ceiling is supported by bar joist steel decking and has two inches of polystyrene insulation; the roof is plastic. The railroad dock is immediately adjacent to the cooler and the railroad spur. The railroad dock and truck dock are open to each other at the southwest corner of the East Property. Both the railroad and truck docks are generally 20 degrees Fahrenheit cooler than outside temperatures in the warmer months and approximately the same temperature as the outside temperature in the cooler months. (e) A 20 feet by 32 feet inspection room which serves as a place to inspect the products. The inspection room was built to the specifications of a processing room. It has plastic walls that are sealed, drains in the floor, a grid ceiling with washable plastic panels, a stainless steel inspection table, a drop meat wash stand, a stainless steel lavatory for the washing of hands, and a scale. The inspection room is located at the east end of the truck dock and south of the freezer. (f) A 20 feet by 32 feet maintenance shop which is *271 used mainly to charge the electric forklift trucks. It also is used as a tool room for repairing or fixing items at the East Property including the forklift trucks. It has a six-inch concrete floor, concrete block walls, a steel deck ceiling, and a plastic roof. The maintenance ship is located at the east end of the truck dock and south of the freezer. (g) An engine room housing the equipment and machinery necessary to operate the refrigeration system and all equipment for the facility including the heat exchangers for the underfloor heating system, the electrical service, and the pumping system or monitoring system for the sprinkler controls. The engine room is the area where power enters the building and where backup power in the form of a diesel engine is stored. The engine room has a six-inch reinforced concrete floor and concrete block walls. The ceiling has steel bar joists with steel decking; the roof is plastic. Since maintaining a constant temperature is critical to petitioner's business, an automated control system which continuously monitors the temperature and the various pressures within the refrigeration system is located in the engine room. The engine room is *272 at the southeast corner of the East Property and is adjacent to the maintenance shop. (h) The main office, restroom, and locker area. This latter area is not in issue in this case. A railroad spur line (approximately 500 feet long) connects the East Property to a railroad line. The railroad spur is adjacent to the railroad dock and the cooler on the west side of the property and is used for delivery of products that are not brought to the East Property by truck. There also are a paved parking lot on the south side of the property (not at issue n this case) and a paved road which connects to a city street. Plans for the East Property were prepared for petitioner by unrelated third party. These plans then were approved by certain entities whose approval was needed, such as Oscar Meyer and Co. ("Oscar Meyer"), a major meat processor and one of the principal customers at the East Property, the Insurance Services Bureau of Iowa (formerly called the Rating Bureau), which verified a rate for fire and extended coverage insurance for the East Property, and the USDA. During construction, some changes were made to these plans; however, petitioner made no significant variations to *273 the plans. At the time of trial, the East Property was the only facility not operated by meat packers that could meet Oscar Meyer's specifications for freezing which, at that time, were more stringent than other packers. According to petitioner's president, Edward Charles Meulhaupt, Jr. ("Meulhaupt"), petitioner did not maintain a separate and distinct log of the expenditures by component to identify those expenditures which it believed qualified for investment tax credit because it believed the entire structure would qualify. According to Meulhaupt, the Internal Revenue Service previously had allowed petitioner to claim ITC on a similar facility it built in 1972. Petitioner did not offer into evidence any schedule showing a cost breakdown of the expenditures by component, or the invoices pertaining thereto, or call as witnesses representatives or the general contractor or the subcontractors who performed the actual work of constructing the facility or its components. According to Meulhaupt, petitioner inspected the building each day while it was being constructed. Petitioner received, examined, and verified every invoice, and Meulhaupt approved every bil land wrote and signed *274 every check. According to Meulhaupt, Newman Brothers, the general contractor for the East Property, submitted 12 invoices to petitioner during the construction of the East Property. The invoices did not give separately a cost breakdown of the various components. Muelhaupt testified that the underfloor heating system cost $ 28,160, for which no ITC was allowed. According to Meulhaupt, Newman Brothers installed the racking core in the freezer for the storage racks upon which the products are placed for a cost of $ 29,305, and for which ITC was not allowed. Respondent allowed ITC for the cost of the racks. Certain equipment in the engine room sits on special bases: there are six large compressors which have large concrete bases, several large ammonia tanks which have steel bases, and two large condensers mounted on the roof of the engine room which have a steel support system based in the engine room. The bases were constructed by Newman Brothers. According to Meulhaupt, the total cost for all these items was $ 83,176, for which no ITC was allowed. Also, according to Meulhaupt, the cost of the special bases was given to petitioner sometime in 1979 or 1980 by someone employed *275 by Newman Brothers. According to Meulhaupt, the railroad spur line cost $ 50,540 to construct. The subcontractor for the spur line was Track Masters. According to Meulhaupt, Newman Brothers, as general contractor, received an additional ten percent on the job. [3]
A large amount of power and wiring is required to run all the refrigeration and other mechanical systems in the plant, including the battery chargers to charge the forklift trucks. According to Meulhaupt, special wiring was required for these purposes which cost $ 101,138, and no ITC was allowed for the special wiring. The electrical work for the East Property was done by Baker Electric which submitted to petitioner five or six invoices for all the work it did on the East Property. No cost breakdown of the separate components of *276 the work was provided on these invoices. According to Meulhaupt, someone from Baker Electric gave petitioner a cost breakdown in 1979 or 1980 for the additional electrical work. Meulhaupt did not know how this figure was derived. Operation of the East Property
The principal services provided by petitioner at the East Property are the blast freezing of fresh products, primarily pork products; the storing of frozen products, primarliy pork; and the unloading and loading of these products. The East Property has a capacity of approximately 18,000,000 pounds and can freeze approximately 200,000 pounds of product per 24-hour period in the blast freezer. The East Property was designed and constructed specifically to accommodate Oscar Meyer's products as a result of that company's need for additional freezer capacity. Petitioner did not enter into a contract with Oscar Meyer to provide any specific amount of space at the facility, however. During 1979, a number of customers used the facility. Oscar Meyer provided between 60 and 80 percent of petitioner's business at the East Property. Of the remaining business, Wilson, Farmland, and Hormel and Company ("Hormel") provided *277 the rest, except for between five and ten percent which was provided by 50 to 100 other, smaller customers. The East Property froze and/or stored only pork for Oscar Meyer, Hormal, and Wilson. Approximately 90 percent of the products received from Oscar Meyer at the East Property are fresh to be frozen. The remaining ten percent are already frozen. The largest items received at the East Property are pork bellies and hams, representing approximately 60 percent of all products received at the East Property. Products arrive at the East Property by truck or by rail. Pork bellies arrive unpackaged but in combo bins. Upon arrival, the pork bellies are placed unwrapped, other than a plastic covering, on pallets. Some of the pork bellies then are placed in the blast freezer. Other fresh products arrive in boxes and are frozen by being placed either in the blast freezer or directly on the freezer. Other frozen products arrive in boxes and are placed directly in the freezer. If a product is frozen when it arrives at the East Property, it will not be put in the blast freezer. Products remain in the dock areas for approximately two hours before being moved into either the blast freezer *278 of the freezer. Generally, the meat products have been sent by the meat processing customers within eight to twenty-four hours from the time they left the meat processing customers' plants. petitioner makes the decision whether fresh products received at the East Property are to be blast frozen unless specifically instructed to do so by the customer. All unfrozen pork bellies received from other customers are either blast frozen or frozen in the freezer as petitioner determines appropriate under the circumstances. Petitioner charges its customers for the services it provides at the East Property based on weight (i.e., by 100 pound weight) and duration of time (i.e., monthly). Specifically, petitioner's customers are charged for storage of products; unloading and loading of products (i.e., handling the products in and out); and for freezing products. When frozen products are received at the East Property, they are handled as follows: (1) the products are unloaded off the trucks or railroad cars into the dock areas; (2) if the products are not already on apllets, they are hand-loaded by petitioner's warehousemen onto pallets; (3) they are stabilized as necessary with spiral wrap; *279 (4) the products are counted; (5) they are weighed and checked in; (6) the products are picked up with electric forklift trucks and taken into the freezer area; and (7) they are placed on racks in the freezer area. When fresh products are received at the East Property, they are handled as follows: (1) the products are unloaded; (2) they are placed on either aluminum or wood spreaders to allow circulation between every piece of meat or box of meat; (3) the products are stabilized as necessary with spiral wrap; (4) they are counted; (5) the products are weighed and checked in; (6) they are picked up with electric forklift trucks and taken either to the blast freezer for a period of 24 hours or to the freezer; (7) the products taken to the blast freezer are subsequently removed to the freezer; and (8) the products taken to the freezer, whether or not blast frozen, are placed on racks in the freezer. Petitioner maintains a very careful inventory of the products stored in the East Property. A nonnegotiable warehouse receipt is issued for each load received. All products are given a lot number to assist in keeping records and in identifying the origin and ownership of the products. *280 The products are identified and inventoried by date, location number, lot number, and name of customer. These detailed records are used to locate the specific products in order to remove them from the freezer and place them n the right truck to send to the proper owner. All of the products stored in the East Property are eventually loaded onto trucks or railroad cars and shipped to their respective owner for further processing or distribution or consumption. Products are held at the East Property for periods of time ranging from a few days to several months. During 1979, petitioner stored minor amounts of various frozen perishable, nonpork, products in the East Property, including butter, turkeys, and frozen vegetables. These items were not significant in amount in relation to the pork products frozen and/or stored there. Petitioner's business for customers other than Oscar Meyer, Wilson, Farmland, and Hormel is conducted on a fill-in basis only as space is available. During 1979, petitioner stored a small amount of perishable food products for a few schools located close to its East Property. It also stored there pork bellies for Louis Dreyfus Corporation -- a commodities *281 trader. Petitioner has the following classifications and numbers of employees at the East Property: (1) one plant manager, (2) two traffic managers; (3) eight to twenty men who are divided into two categories, warehousemen (i.e., loaders and unloaders of products) and forklift operators (i.e., operators of electric forklift trucks and pallet trucks). The human activity that takes place in the various areas of the East Property is as follows: (a) In the freezer, forklift operators operating forklift trucks bring products in, stack the products on racks, remove the products from the racks, and take the products out of the freezer. In addition, the plant manager goes into the freezer at least once or twice a day to inspect and check the equipment, gauges, and products. Furthermore, there is an employee in the freezer for a few hours every day or every other day in order to clean the area. The freezer's aisles are wide enough to provide working space for petitioner's employees and forklifts as well as additional storage space. (b) In the cooler, warehousemen unload and load products from trucks. Also, the warehousemen stack the products on pallets, check the products, count *282 the products, weigh the products, and to some degree inspect the products in this area. Furthermore, the plant manager has an office on the truck dock which he uses. The warehousemen also use this office to warm up when they come out of the freezer. Anywhere from eight to fifteen warehousemen can be simultaneously unloading or loading four or five trucks on the truck dock. On the railroad dock, warehousemen unload and load products from railroad cars. During the course of unloading and loading trucks at the East Property, petitioner's employees frequently must make trips into and out of the freezer. The enclosed truck dock and railroad dock provide working space for petitioner's employees to unload and load products, stack products on pallets, stabilize the products with spiral warp, count the products, weigh the products, and check in and out the products. (d) In the inspection room, representatives of the USDA, petitioner's customers (i.e., quality assurance personnel of the various customers), and petitioner's employees inspect the products. The inspection room provides working space for the inspection of products. (e) In the maintenance shop, forklift operators bring *283 the forklift trucks and pallet trucks to plug them into electrical battery chargers. The maintenance shop provides working space for petitioner's employees to charge the batteries of the electric forklift and pallet trucks used in the East Property and to perform some maintenance and repir work on these vehicles. (f) In the engine room, on a daily basis an engineer checks the recording devices and dos some maintenance such as adding oil to the machines or checking various fluid levels. If anything breaks in the engine room, the repair of the broken equipment takes place in the engine room. Normally, the engine room is unoccupied because of the automated system used at the East Property. The engine room provides working space for petitioner's employees to maintain, monitor, and repair the equipment and machinery located in this room. The freezing of meat and meat products is done principally to extend storage life beyond that achieved under normal refrigeration temperatures 9temperatures above 32 degrees Fahrenheit). The East Property is not a storage facility for fungible commodities. The Notice of Deficiency
On its 1979 Federal income tax return, petitioner claimed *284 investment credit of $ 221,941 with respect to the East Property on a total investment amount of $ 2,252,976.98, consisting of the following: Handling Equipment
$   228,157,07
Machinery
486,717,65
Paving and Concrete Docks
30,763.00
East Building
1,507,339,26
Total
$ 2,252,976.98
Handling equipment included forklift trucks and the racks upon which the products are placed in the freezer. Machinery included refrigeration equipment and controls, piping, and the installation of the equipment. Paving and concrete docks included the cost of the outside dock area where trucks park to load and unload product at the property. The amount of investment tax credit claimed for the handling equipment, machinery, and paving has been allowed by respondent, and is not in dispute. Petitioner claimed unused investment credit of $ 73,958 for 1979 which it carried back to 1976 and for which petitioner received a refund for 1976 of $ 75,777. Respondent disallowed investment tax credit on an investment pertaining to the East Property calculated as follows: Total cost including land
$ 2,620,208.00
less: costs allocated to
machinery, handling
equipment, paving,
concrete, and land:
$ 1,007,824.00
cost of sprinkler work:
78,000.00
cost of concrete
included in above
claimed as part of
dock:
9,598.00
cost of office area
(based on square feet):
17,447.28
Total adjustments to total cost
1,112,869.28
Net disallowed investment amount
[4] $ 1,507,338.72
*285 The amount of investment tax credit pertaining to the East Property claimed by petitioner which was disallowed by respondent is $ 150,734.00. In 1979 petitioner also modified an existing cold storage facility (the "South Des Moines Building") in order to rent a portion of this facility to Hudson Foods. Hudson Foods stores, freezes, and to a limited extent, cuts up processed chickens into parts that may be sold to its customers. The parties have agreed that in regard to the "South Des Moines Building," petitioner placed in service during the 1979 taxable year qualified "section 38 property" in the amount of $ 16,685.61 instead of the $ 33,371.21 claimed. Accordingly, the amount of investment tax credit claimed by petitioner in regard to the "South Des Moines Building" for the taxable year 1979 is reduced by the amount of $ 1,685.06. Petitioner concedes that, excluding certain specified components, i.e., the underfloor heating system, the railroad spur, the freezer racking *286 core, the wiring for the refrigeration equipment, and the equipment bases, the East Property does not constitute "tangible personal property" within the meaning of section 48(a)(1)(A); the East Property does not constitute a "research facility" within the meaning of section 48(a)(1)(B)(ii); and the East Property does not constitute a facility for "the bulk storage of fungible commodities" within the meaning of section 48(a)(1)(B)(iii). The parties have stipulated that the East Property had a useful life of seven years or more determined as of the time the property was placed in service. The parties also have stipulated that the East Property is tangible property with respect to which depreciation is allowable. OPINION Petitioner contends that the East Property is tangible property specially designed and constructed for the freezing and frozen storage of fresh pork, and, as such, is essentially an item of machinery or equipment. Petitioner argues further that the freezing and frozen storage of fresh pork is an integral part of the manufacture of pork products. Consequently, petitioner contends, the East Property is qualifying "section 38 property" and petitioner is, therefore, *287 entitled to ITC on the cost of constructing the East Property. Alternatively, petitioner argues that, independent of whether the East Property qualifies as "section 38 property," certain components of the East Property are "section 38 property" and petitioner, therefore, is entitled to ITC on their cost. Respondent, on the other hand, takes the position that the East Property does not qualify as either "tangible personal property" within the meaning of section 48(a)(1)(A) or "other tangible property" within the meaning of section 48(a)(1)(B). Respondent further argues that all of the specified components are structural components of the East Property and, therefore, do not qualify as "section 38 property." I. The East Property as "Section 38 Property"
Section 38 provides as follows: SEC. 38. INVESTMENT IN CERTAIN DEPRECIABLE PROPERTY. (a) General Rule. -- There shall be allowed, as a credit against the tax imposed by this chapter, the amount determined under subpart B of this part. (b) Regulations. -- The Secretary shall prescribe such regulations as may be necessary to carry out the purposes of this section and subpart B. Section 46(a) provides, in part, that *288 the amount of credit allowed by section 38 for the taxable year shall be a specified percentage of the "qualified investment" for the year. Section 46(c), in part, defines the term "qualified investment" to include the applicable percentage of the basis of the "section 38 property" placed in service during the taxable year. Section 48(a) defines "section 38 property" in pertinent part as follows: Sec. 48. DEFINITIONS; SPECIAL RULES. (a) Section 38 Property.
(1) In general. Except as provided in this subsection, the term "section 38 property" means -- (A) tangible personal property (other than an air conditioning or heating unit), or (B) other tangible property (not including a building and its structural components) but only if such property -- (i) is used as an integral part of manufacturing, production, or extraction, or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or * * * Such term includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 3 years *289 or more. Tangible personal property and other tangible property are defined in sections 1.48-1(c) and (d) of the Income Tax Regulations as follows: § 1.48-1. Definition of section 38 property. * * * (c) Definition of tangible personal property. If property is tangible personal property it may qualify as section 38 property irrespective of whether it is used as an integral part of an activity (or constitutes a research or storage facility used in connection with such activity) specified in paragraph (a) of this section. Local law shall not be controlling for purposes of determining whether property is or is not "tangible" or "personal". Thus, the fact that under local law property is held to be personal property or tangible property shall not be controlling. Conversely, property may be personal property for purposes of the investment credit even though under local law the property is considered to be a fixture and therefore real property. For purposes of this section, the term "tangible personal property" means any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural *290 components of such buildings or structures). Thus, buildings, swimming pools, paved parking areas, wharves and docks, bridges, and fences are not tangible personal property. Tangible personal property includes all property (other than structural components) which is contained in or attached to a building. Thus, such property as production machinery, printing presses, transportation and office equipment, refrigerators, grocery counters, testing equipment, display racks and shelves, and neon and other signs, which is contained in or attached to a building, constitutes tangible personal property for purposes of the credit allowed by section 38. Further, all property which is in the nature of machinery (other than structural components of a building or other inherently permanent structure) shall be considered tangible personal property even though located outside a building. Thus, for example, a gasoline pump, hydraulic car lift, or automatic vending machine, although annexed to the ground, shall be considered tangible personal property. (d) Other tangible property -- (1) In general. In addition to tangible personal property, any other tangible property (but not including *291 a building and its structural components) used as an integral part of manufacturing, production, or extraction, or as an integral part of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services by a person engaged in a trade or business of furnishing any such service, or which constitutes a research or storage facility used in connection with any of the foregoing activities, may qualify as section 38 property. Petitioner concedes that, excluding certain specified components of the facility to be discussed separately infra, the East Property does not constitute "tangible personal property" within the meaning of section 48(a)(1)(A). Petitioner also concedes that the East Property does not constitute a "research facility" within the meaning of section 48(a)(1)(B)(ii) or a facility for the "bulk storage of fungible commodities" within the meaning of section 48(a)(1)(B)(iii). Therefore, we are concerned primarily with whether the East Property is "other tangible property" used as an integral part of manufacturing, production, or extraction as provided in section 48(a)(1)(B)(i). Petitioner bears the burden of proving that it is entitled *292 to the claimed investment tax credit. L&B Corp. v. Commissioner,88 T.C. 744, 755 (1987); Rule 142(a). Section 48(a)(1)(B) specifically excludes from other tangible property buildings and their structural components. Therefore, we first will consider whether the East Property constitutes a building. The term "building" is given its commonly accepted meaning. Loda Poultry Co. v. Commissioner,88 T.C. 816, 824 (1987); Consolidated Freightways v. Commissioner,74 T.C. 768, 793 (1980), affd. on this point 708 F.2d 1385 (9th Cir. 1983). A. The East Property as a Building
"Building" is defined in section 1.48-1(e)(1), Income Tax Regs., as follows: Sec. 1.48-1. Definition of section 38 Property. * * * (e) Definition of building and structural components. (1) Buildings and structural components thereof do not qualify as section 38 property. The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. *293 The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. Such term includes any such structure constructed by, or for, a lessee even if such structure must be removed, or ownership or such structure reverts to the lessor, at the termination of the lease. Such term does not include (i) a structure which is essentially an item of machinery or equipment, or (ii) a structure which houses property used as an integral part of an activity specified in section 48(a)(1)(B)(i) if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property is initially houses is replaced. Factors which indicate that a structure is closely related to the use of the property it houses include the fact that the structure is specifically designed to provide for the stress and other demands of such property and the fact that the structure could not be economically used for other purposes. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating *294 towers, blast furnaces, basic oxygen furnaces, coke ovens, brick kilns, and coal tipples. [Emphasis added.]
We previously have indicated that this regulation is a legislative regulation, almost as binding as the statute itself. L&B Corp. v. Commissioner,88 T.C. at 756. Section 1.48-1(e) provides for a two-part test to determine whether a structure is a building. The first test, the appearance test, requires that a structure look like a building, i.e., "a structure or edifice enclosing a space within its walls, and usually covered by a roof." The second test, the functional test, generally requires that the structure be used like a building, i.e., "to provide shelter or housing, or to provide working, office, parking, display, or sales space," or a similar function. Sec. 1.48-1(e)(1), Income Tax Regs.; L&B Corp. v. Commissioner, supra;Munford, Inc. v. Commissioner,87 T.C. 463, 479 (1986). Although this Court emphasizes the functional test to determine whether a structure is a building, jurisdiction for an appeal in this case lies in the Federal Court of Appeals for the Eighth Circuit which requires that a structure satisfy *295 both the appearance test and the functional test to qualify as a building. Yellow Freight System, Inc. v. United States,538 F.2d 790, 796-798 (8th Cir. 1976). Therefore, both tests must be used for our determination. Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971). In appearance, the East Property looks like a building. We viewed the premises as well as examined photographs and drawings of the property contained in the record. The East Property is a permanent structure of substantial dimension enclosing spaces surrounded by walls and covered by a roof. See sec. 1.48-1(e)(1), Income Tax Regs.; L&B Corp. v. Commissioner,88 T.C. at 758. Petitioner argues that the East Property does not physically look like or resemble a warehouse building because of the heavy machinery on the roof and the absence of truck access along its east and north boundaries. The presence [Text Deleted by Court Emendation] or absence of these features, however, does not alter the building-like appearance of the structure. L&B Corp. v. Commissioner, supra. *296 Next, we must consider whether the East Property functions as a building. The facility has a number of compartments which have different functions. Therefore, we will examine the separate compartments according to their respective functions. Loda Poultry Co. v. Commissioner, supra;Munford, Inc. v. Commissioner, supra.
The Court recently applied the functional test to determine whether refrigerated structures, similar to the one in issue here, were buildings. See L&B Corp. v. Commissioner, supra;Loda Poultry Co. v. Commissioner, supra; and Munford, Inc. v. Commissioner, supra. In Munford, Inc. v. Commissioner, we reiterated that the functional test requires a determination of "whether the purpose of the structure at issue is a purpose ejusdem generis to the purposes [i.e., "to provide shelter or housing, or to provide working, office, parking, display, or sales space"] described by example in section 1.48-1(e)(1), Income Tax Regs., * * * " 87 T.C. at 480, citing Consolidated Freightways v. Commissioner,74 T.C. at 795. We also stated in Munford v. Commissioner, *297 at 480 that: In applying the functional test, a major focus of inquiry is whether the structure provides working space for employees which is more than merely incidental to the primary function of the structure. See, e.g., Brown-Forman Distillers Corp. v. United States, 205 Ct. Cl. [402] at 418, 499 F.2d [1263] at 1271 [1974]; Valmont Industries, Inc. v. Commissioner, [73 T.C. 1059]supra at 1072 [1980]; Scott Paper Co. v. Commissioner, [74 T.C. 137]supra at 178 [1980]; Catron v. Commissioner, [50 T.C. 306]supra at 316 [1968]. In this regard, it is appropriate to consider both the quantity and quality of the human activity within the structure. See Consolidated Freightways v. United States, 223 Ct. Cl. [443] at 461, 620 F.2d [862] at 873 [1980]; Consolidated Freightways v. Commissioner,74 T.C. at 795; Satrum v. Commissioner, [62 T.C. 413]supra at 4177 [1974]. * * *
With these principles in mind, we now examine the separate compartments of the East Property to determine whether one or more of them functions *298 as a building. 1. The Freezer and the Cooler
The facts in this case pertaining to the functions of the freezer and the cooler are virtually indistinguishable from the facts pertaining to the refrigerated area, the zero-degree, 28-degree, and 32-degree compartments, and the refrigerated structure in Munford, Inc. v. Commissioner, supra;Loda Poultry Co. v. Commissioner, supra; and L&B Corp. v. Commissioner, supra. Here, as in those specific areas in those cases, the freezer and the cooler are used to freeze and/or store foodstuff. The evidence does not indicate that any significant human activity, of quantity or quality, takes place in either the freezer or the cooler. These areas do not function as working space for employees and equipment which is more than incidental to the primary function of these areas which is to freeze meat and/or provide low temperature storage for the meat and other food products. L&B Corp. v. Commissioner,88 T.C. at 760. Consequently, we find that the freezer and the cooler do not function as buildings. 2. The Truck Dock and the Railroad Dock
The facts in this case pertaining *299 to the functions of the truck dock and railroad dock (collectively the "dock areas") are virtually indistinguishable from the facts pertaining to the loading areas in Munford, Inc. v. Commissioner, supra, and Loda Poultry Co. v. Commissioner, supra. Here, as in those cases, the dock areas serve to provide working space for the loading and unloading of commodities. The purpose of the dock areas, the movement of freight, is accomplished primarily by the efforts of those employees who work on the dock areas. This human activity is essential, rather than merely incidental, to the function of the dock areas. Therefore, we find that the truck dock and the railroad dock function as buildings within the meaning of section 48(a)(1) and, thus, are not "section 38 property." See Loda Poultry Co. v. Commissioner,88 T.C. at 825-825; Munford, Inc. v. Commissioner,87 T.C. at 481-482; Consolidated Freightways v. Commissioner, supra.
3. The Inspection Room
The inspection room serves as a place primarily for USDA inspectors, petitioner's customers, and petitioner's employees to inspect the products. Although *300 the record does not show the number of hours per day that the room is used for this purpose, it appears from this record that the human activity is not "incidental" to the primary function of the area. In fact, as was the "cutting room" in Loda Poultry Co. v. Commissioner,88 T.C. at 826, the primary function of the inspection room is the very work performed there by the USDA inspectors, the customers, or petitioner's employees. Accordingly, we find that the inspection room functions as a building and this area is not "section 38 property." 4. The Maintenance Shop
The maintenance shop is used primarily for recharging the batteries of the electric trucks and forklifts. It also is used for repairing certain equipment used at the facility. Since some maintenance and repairing of equipment is needed, the shop obviously provides some working space. See Coors v. Commissioner,60 T.C. 368, 406 (1973). The record, however, is not sufficient to reveal the quantity or quality of the human activity which occurs in the maintenance room. See Consolidated Freightways v. Commissioner,74 T.C. at 795. Although plugging in the electric *301 vehicles to the chargers probably takes minimal time and effort, repairing these vehicles and other equipment may or may not result in significant human activity. Consequently, we are unable to determine whether the human activity within the maintenance room is merely incidental to the other functions of the room. Petitioner has the burden of proving that it is entitled to the claimed investment tax credit and has failed to carry its burden as to this area. Consequently, we find that the maintenance shop does not qualify as "section 38 property." 5. Engine Room
The engine room is used to house the equipment and machinery needed to operate the facility, primarily the refrigeration system. The equipment in the engine room is automated and the room normally is unoccupied. The only human activity is the daily monitoring of the recording records, and some maintenance on the equipment. The evidence does not show the exact amount of time when human activity occurs in this area, but, from the record, it appears to be nominal and incidental to the main function of the area, the housing of equipment and machinery. See Vail Associates, Inc. v. Commissioner,88 T.C. 1391, 1404 (1987) *302 (pumphouse which houses and protects equipment used in manufacturing snow is not a building). Consequently, we find that the engine room does not function as a building. Having concluded that the freezer, the cooler, and the engine room do not function as buildings, we must determine whether these areas otherwise qualify for investment tax credit under section 48(a)(1)(B)(i). B. The East Property as an Integral Part of Production
Petitioner contends that the East Property was designed and is used to freeze and maintain in a frozen state perishable meat products and is essentially an item of machinery or equipment. Petitioner further argues that the freezing and frozen storage of fresh pork is an integral part of the manufacture of pork products, and, thus, the facility qualifies as "section 38 property." Section 1.48-1(d)(2), Income Tax Regs., defines "manufacturing" as follows: § 1.48-1. Definition of section 38 property. (d) Other tangible property -- (2) Manufacturing, production, and extraction. For purposes of the credit allowed by section 38, the terms "manufacturing", "production", and "extraction" include the construction, reconstruction, or making *303 of property out of scrap, salvage, or junk material, as well as from new or raw material, by processing, manipulating, refining, or changing the form of an article, or by combining or assembling two or more articles, and include the cultivation of the soil, the raising of livestock, and the mining of minerals. Thus, section 38 property would include, for example, property used as an integral part of the extracting, processing, or refining of metallic and nonmetallic minerals, including oil, gas, rock, marble, or slate; the construction of roads, bridges, or housing; the processing of meat, fish or other foodstuffs,; the cultivation of orchards, gardens, or nurseries; the operation of sawmills, the production of lumber, lumber products or other building materials; the fabrication or treatment of textiles, paper, leather goods, or glass; and the rebuilding, as distinguished from the mere repairing, of machinery. In L&B Corp. v. Commissioner,88 T.C. at 761-765, we considered the question whether property used for the freezing, including blast freezing, and ultimate storage of meat was an integral part of the processing of meat, and therefore eligible for investment *304 tax credit. There we stated at 763-764: Upon consideration of all the facts, including the extensive testimony by the food experts, we conclude that a "process" did not occur at petitioners' refrigerated structures within the meaning of the relevant statute and regulations. Although we have found the testimony of respondent's expert to be the most persuasive, we believe that the initial freezing function was secondary and merely a necessary step toward the primary function of the refrigerated structures, i.e., low temperature storage. The cases relied upon by petitioners are distinguishable in that they represent situations where the food product incurred changes necessary, in those particular circumstances, for providing a desirable or finished product. Such changes included (1) the prevention of dehydration and shrinkage and the removal of ethylene gas in the production of fresh fruit (Giannini Pack [sic] Corp. v. Commissioner, [83 T.C. 526 (1984)]supra), and (2) the necessary "degreening" of certain fruit ( Central Citrus Co. v. Commissioner, [58 T.C. 365 (1972)]supra). See also Brown-Forman Distillers Corp. v. United States,205 Ct. Cl. 402, 499 F.2d 1263 (1974), *305 where the maturation of whiskey was determined a process because it aged the whiskey; and Schuyler Grain Co. v. Commissioner,500 T.C. 265 (1968), affd. 411 F.2d 649 (7th Cir. 1969), where the aeration and drying of grain was determined a process because it improved the quality of the grain for its intended use. The freezing and storage of meat in petitioners' refrigerated structures simply did not render a change in the product consistent with the decided cases. We therefore hold that in this case the freezing and cold storage of meat was not a "processing of meat" that qualifies for investment tax credit under section 48(a)(1)(B)(i). [Footnote reference omitted.] The facts in this case are indistinguishable from those in L&B Corp. v. Commissioner, supra. Therefore, we find L&B Corp. to be controlling and holding that petitioner is not engaged in a qualifying activity. Consequently, the freezer, the cooler, and the engine room also do not qualify as "section 38 property" and, thus, petitioner is not entitled to ITC on their cost. II. Components as "Section 38 Property"
Petitioner argues in the alternative that, independent *306 of whether the East Property as a whole qualifies as "section 38 property," the underfloor heating system, the railroad spur, the freezer racking core, special electrical wiring for the refrigeration equipment, and the equipment bases, are tangible personal property or other tangible property used as an integral part of manufacturing or production. Therefore, petitioner contends, these components are qualifying property eligible for ITC. We already have determined that petitioner is not engaged in a qualifying activity. Therefore, we need not address again the question of whether any of the components are other tangible property used as an integral part of manufacturing or production. We now will consider whether these components are tangible personal property under section 48(a)(1)(A). Section 48(a)(1)(A) generally excludes from its scope not only buildings, but also other inherently permanent structures and their structural components. Munford, Inc. v. Commissioner,87 T.C. at 489. Petitioner bears the burden of proving that the subject components are not inherently permanent, structural components. Scott Paper Co. v. Commissioner,74 T.C. 137, 179 (1980). *307 We pointed out in Whiteco Industries, Inc. v. Commissioner,65 T.C. 664 (1975), that tangible personal property is not to be narrowly defined or to necessarily follow the rules of state law. H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 405, 415. Generally, all tangible property is tangible personal property unless it is excluded as land or an improvement thereto. In Whiteco Industries, Inc. v. Commissioner, supra at 672-673, we listed the following criteria for determining whether property is tangible personal property within the meaning of section 48(a)(1)(A): (1) Is the property capable of being moved, and has it in fact been moved? * * * (2) Is the property designed or constructed to remain permanently in place? * * * (3) Are there circumstances which tend to show the expected or intended length of which show that the property may or will have to be moved? * * * (4) How substantial a job is removal of the property and how time-consuming is it? Is it "readily removable"? * * * (5) How much damage will the property sustain upon its removal? * * * (6) What is the manner of affixation of the property to the land? * * *308 *
See Scott Paper Co. v. Commissioner,74 T.C. 16 170-172, which also discusses these questions in determining whether an item is tangible personal property for the purpose of the investment tax credit. The term "structural components" is defined in section 1.48-1(e)(2) of the Income Tax Regulations as follows: (2) The term "structural components" includes such parts of a building as walls, partitions, floors, and ceilings, as well as any permanent coverings therefor such as panelling or tiling; windows and doors; all components (whether in, on, or adjacent to the building) of a central air conditioning or heating system, including motors, compressors, pipes and ducts; plumbing and plumbing fixtures, such as sinks and bathtubs; electric wiring and lighting fixtures; chimneys; stairs, escalators, and elevators, including all components thereof; sprinkler systems; fire escapes; and other components relating to the operation or maintenance of a building. However, the term "structural components" does not include machinery the sole justification for the installation of which is the fact that such machinery is required to meet temperature or humidity requirements *309 which are essential for the operation of other machinery or the processing of materials or foodstuffs. Machinery may meet the "sole justification" test provided by the preceding sentence even though it incidentally provides for the comfort of employees, or serves, to an insubstantial degree, areas where such temperature or humidity requirements are not essential. For example, an air conditioning and humidification system installed in a textile plant in order to maintain the temperature or humidity within a narrow optimum range which is critical in processing particular types of yarn or cloth is not included within the term "structural components". * * * [Emphasis added.] With these principles in mind, we look at the specific components for which petitioner claims it is entitled to ITC. A. The Underfloor Heating System
Respondent argues that the underfloor heating system is inherently permanent and constitutes a structural component of the East Property. Petitioner, on the other hand, contends that the underfloor heating system is part of the refrigeration system and, as such, is essentially an item of machinery or equipment and not a structural component of any *310 building. Petitioner also contends that the underfloor heating system is not a structural component of the East Property because it is machinery, the sole justification for the installation of which was to meet temperature or humidity requirements which are essential for the operation of other machinery or the processing of materials or foodstuffs. Since we already have found that petitioner was not engaged in the processing of foodstuffs, to prevail on this argument, petitioner must establish that the underfloor heating system is machinery in sole justification for the installation of which was to meet temperature or humidity requirements which are essential for the operation of other machinery. To establish this, petitioner must prove that the underfloor heating system is an item of machinery inseparable from or forming an integral mechanism with the rest of the refrigeration equipment. See Munford, Inc. v. Commissioner,87 T.C. at 493. See also Yellow Freight System, Inc. v. United States,538 F.2d at 796-797; Sunnyside Nurseries v. Commissioner,59 T.C. 113, 121 (1972). Section 1.48-1(e)(2), Income Tax Regs., defines central *311 air conditioning and heating systems as structural components unless the "sole justification" test is met. When such systems are not considered structural components because they meet the sole justification test, they may be considered property in the nature of machinery, and, thus, qualify as tangible personal property without further examination of their inherent permanence. Piggly Wiggly Southern, Inc. v. Commissioner,84 T.C. 739, 753 (1985), affd. on this issue 803 F.2d 1572 (11th Cir. 1986). In Piggly Wiggly Southern, we found that HVAC units installed in petitioner's stores were not structural components because Piggly Wiggly's sole justification for installation of the HVAC units in issue was that the units were essential to meet temperature or humidity requirements for the operation of open-front refrigeration cases used in these stores, and that the benefit to petitioner's workers and customers was incidental. Piggly Wiggly Southern, Inc. v. Commissioner,84 T.C. at 753. Here, according to petitioner's president, Muelhaupt, the underfloor heating system was designed to prevent frost penetration which eventually could destroy *312 the structure. There is nothing in the record to indicate that the underfloor heating system was needed to meet temperature or humidity requirements which are essential for the operation of "other machinery." Petitioner's argument, rather, is based on the premise that the structure itself operated as a large refrigerator freezer, and that the underfloor heating system is really part of the refrigeration system. In Munford, Inc. v. Commissioner, supra, the petitioner there argued that a refrigerated facility, very similar to the East Property here in issue, used to receive and store on behalf of frozen food processors, final-processed, packaged frozen foods at low temperatures was tangible personal property qualifying as "section 38 property" under section 48(a)(1)(A) because it was in essence a giant refrigerator or freezer, and thus, "property which is in the nature of machinery" described in the penultimate sentence of section 1.48-1(c), Income Tax Regs. We found that the refrigerated area was not a building under the functional test. Munford, Inc. v. Commissioner,87 T.C. at 483. We then considered whether the structural elements of the refrigerated *313 area of the facility, including its foundation footings, walls, floor, roofing and supports, vapor barrier, insulation, and electrical components allocable thereto, qualified as tangible personal property. The taxpayer argued there, as petitioner argues here, that the structural elements of the refrigerated area operated together with the refrigeration system to make the refrigerated area function like a giant refrigerator or freezer and, thus, were property in the nature of machinery. We found that the structural elements of the refrigerated area considered individually were not property in the nature of machinery. Munford, Inc. v. Commissioner,87 T.C. at 492-493. We stated further at 493-494 that: Moreover, even if we were to go beyond the approach taken in Weirick v. Commissioner, supra, [62 T.C. 446 (1974)] by considering the refrigerated area of the Addition as a whole, our conclusion would be the same. The refrigerated area is a fixed, stationary structure. Its primary function is to store frozen foods at low temperatures. Although it contains, and functions with the aid of, refrigeration system components which are in the nature of machinery, *314 we do not think that the structure's primary function may be thought of as mechanical or accomplished by "machinery" in the ordinary sense of that term. Thus, we do not think that, considered as a whole, the refrigerated area of the Addition may fairly be characterized as property in the nature of machinery within the meaning of section 1.48-1(c), Income Tax Regs. [Footnote omitted.] We find Munford, Inc. v. Commissioner, supra, to be controlling here. Therefore, we find that neither the individual components of the East Property nor the East Property as a whole constitute property in the nature of machinery. The record reveals no other machinery for which the underfloor heating system was needed to meet temperature or humidity requirements. Petitioner does not argue that the underfloor heating system is not inherently permanent. Therefore, petitioner has failed to establish that the underfloor heating system is qualifying "section 38 property." B. The Railroad Spur
Petitioner contends that the cost of the railroad spur qualifies for investment tax credit under section 1.481-(d)(4), Income Tax Regs., which specifically qualifies railroad tracks as *315 "section 38 property." As respondent points out, however, the railroad spur would so qualify only if petitioner were engaged in a qualifying activity under section 48(a)(1)(B). We already have determined that petitioner is not so engaged. Consequently, petitioner has failed to establish that the railroad spur is "section 38 property." C. The Freezer Racking Core
The freezer area contains five rows of bins. Each row contains from 49 to 69 bins capable of storing up to three pallets deep and four pallets high of products within its shelves. According to petitioner, respondent allowed the cost of the metal racks as qualifying "section 38 property," as "handling equipment," but did not allow the cost of installing the racking core. [5] According to Muelhaupt, petitioner used union carpenters and iron workers hired through Newman Brothers to install the racking core at a cost of $ 29,305. Newman Brothers did not provide a separate invoice for this installation. According to Muelhaupt, someone from Newman Brothers gave petitioner a breakdown in 1979 to the cost of the racking core. Petitioner did not offer the invoices into evidence or call as a witness a representative from *316 Newman Brothers. Petitioner did not offer into evidence any schedule showing a breakdown of the cost of the installation of the racking core to explain how the $ 29,305 was derived. Respondent contends that the freezer racking core is inherently permanent and constituted a structural component of the East Property which does not qualify as "section 38 property" pursuant to section 48(a)(1)(A). Respondent also argues that the only evidence on which petitioner relies to establish the actual cost of the various components is the self-serving testimony of Muelhaupt and the hearsay statements of unknown third parties. Thus, respondent continues, petitioner has not *317 established the actual cost of the various structural components through credible evidence. The permanency of a building component has been considered an important factor in determining whether it is a structural component. See Kramertown Co. v. Commissioner,488 F.2d 728, 731 (5th Cir. 1974), affg. a Memorandum Opinion of this Court; King Radio Corp. v. United States, 486 f.2D 1091, 1096 (10th Cir. 1973); Minot Federal Savings & Loan Assn. v. United States,435 F.2d 1368, 1369-1370 (8th Cir. 1970). There is nothing in the record that establishes the nature of the racking core, [6] the ease with which the racking core could be removed, what, if any, damage the racking core would sustain upon removal, or whether the racking core could be removed and reused. Petitioner has the burden of proving this matter, Standard Oil Co. v. Commissioner,77 T.C. 349, 409 (1981), and, from this record, has failed to prove that the racking core is not an inherently permanent structure. Thus, petitioner has failed to prove that the racking core is qualifying "section 38 property." *318 D. Wiring for Refrigeration System
Petitioner also contends that special electrical wiring costs were incurred over and above the costs for the electrical wiring related to the lights and other basic electrical needs of the East Property to provide the large amount of power and wiring required to run all the refrigeration and all the other mechanical systems in the plant, including the battery chargers to charge the forklift trucks. Petitioner argues that the wiring in essentially part of the refrigerator equipment and, as such, qualifies as "section 38 property" pursuant to section 48(a)(1)(A). Respondent, on the other hand, contends that the electrical wiring is inherently permanent and constitutes structural components of the East Property which does not qualify as "section 38 property." Respondent also argues that petitioner did not substantiate the cost of the special wiring with sufficient, reliable evidence. The record contains no breakdown of the various components of the special electrical wiring or the costs attributable to the various components claimed by petitioner. According to Muelhaupt, the cost of the wiring for the machinery, for which respondent allowed *319 no ITC, was $ 101,138. Baker Electric did the electrical work at the East Property but did not provide a separately stated invoice for the special electrical wiring costs claimed by petitioner. According to Muelhaupt, someone at Baker Electric gave petitioner a breakdown in 1979 of the cost for the special electrical wiring. Muelhaupt did not know how this amount was derived. Petitioner did not offer the invoices into evidence at the trial or call as a witness a representative of Baker Electric. Petitioner also did not submit a breakdown of the cost of the special wiring it is claiming to show how the $ 101,138 cost was determined, or present any evidence to establish the percentage of kilowatt hours attributed to the electrical consumption necessary to power the eligible "section 38" machinery and equipment. [7]
Section 1.48-1(e)(2) specifically classifies "electric wiring and lighting fixtures" as structural components. However, in Scott Paper Co. v. Commissioner, supra, we concluded that the components of the taxpayer's primary electric system which supplied the electrical needs of process *320 machinery rather than contributing to the overall operation or maintenance of buildings was not an inherently permanent structure and the taxpayers were entitled to the investment tax credit on these components. We concluded that property fails to qualify for the credit if it relates to the overall operation or maintenance of a building rather than being used to aid in the employment of a particular function or particular piece of property. We focused on the ultimate uses of power at the taxpayer's facility in Scott Paper Co. and distinguished the power used in the overall operation or maintenance, such as lighting, heating, ventilation, and air-conditioning of the building and the power used to operate the taxpayer's machinery. Scott Paper Co. v. Commissioner,74 T.C. at 183-184. We thus concluded in Scott Paper Co. that: To the extent that the primary electric carried electrical loads to be used for pulp and paper production processes or other such qualifying uses, the investment credit will be allowed for the primary electric improvements. To the extent that the primary electric improvements relate to the overall operation [or] maintenance *321 of buildings, they are structural components of such buildings, and they do not qualify as tangible personal property. Central Citrus Co. v. Commissioner,58 T.C. 365 (1972); Ponderosa Mouldings, Inc. v. Commissioner,53 T.C. 92 (1969); sec. 1.48-1(c), Income Tax Regs., * * * [Scott Paper Co. v. Commissioner, supra at 186. Emphasis added.] The record here is not sufficient for us to determine what components make up the purported $ 101,138 cost for special wiring or whether all, or any part of, these components supplied only the electrical needs of petitioner's equipment and machinery rather than contributing to the overall operation or maintenance of the East Property. Petitioner submitted no evidence other than the testimony of its president, Muelhaupt, to establish that the subject wiring was used solely to supply power for the refrigeration system or the other mechanical systems in the plant. Nor has petitioner adequately substantiated the cost of the components of the special wiring it is claiming. Muelhaupt's testimony on these matters was merely conclusory. The Court is not required to accept unquestionably the self-serving *322 testimony of petitioner. See Tokarski v. Commissioner,87 T.C. 74. 77 (1986). Nor can we assume that the testimony of critical, absent witnesses would have been favorable to petitioner. Indeed, the normal inference is that it would have been unfavorable. Pollack v. Commissioner,47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968). See also Tokarski v. Commissioner, supra;Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). While we found Muelhaupt to be a forthright witness and do not mean to fault his credibility, his testimony as to costs involved mainly was either hearsay or self-serving and lacked specificity. Furthermore, there was either no or inadequate business records to substantiate his assertions. Petitioner has the burden of proof and has failed to sustain it here. Therefore, we find that petitioner is not entitled to ITC for "special wiring." 5. Equipment Bases
According to Muelhaupt, there are six large compressors in the engine room which sit on concrete bases that are sunk down lower than the floor *323 because they must have more foundation than the floor, the bases are built into the floor to support the heavy machinery, they have a large amount of reinforced steel in them, and have specific volt anchors. According to Muelhaupt, there also are several large ammonia tanks in the engine room which have steel bases, and, mounted on the roof of the engine room, there are two large condensers for which steel support systems go through the engine room. Petitioner contends that these special concrete or steel bases support the weight of the heavy machinery and are essentially part of the machinery. Therefore, petitioner claims, the bases qualify as "section 38 property" pursuant to section 48(a)(1)(A) and section 1.48-1(e)(2), Income Tax Regs. Respondent contends that the equipment bases are structural components of the East Property, not tangible personal property, and further that petitioner did not substantiate the cost of the equipment bases with sufficient, reliable evidence. According to Muelhaupt, these special equipment bases were constructed by Newman Brothers at a cost of $ 83,176 and respondent did not allow ITC for their cost. Newman Brothers did not provide an invoice *324 which separately stated the cost of the equipment bases. According to Muelhaupt, someone from Newman Brothers told petitioner the cost of the equipment bases sometime in 1979 or 1980. Muelhaupt did not know how Newman Brothers calculated this cost. Petitioner did not offer the invoices into evidence, call as a witness a representative of Newman Brothers, or submit a breakdown of the cost of the equipment bases to show how the $ 83,176 was derived. We agree with respondent that petitioner did not sustain its burden of proof as to the cost of the special equipment bases. The deficiency notice has the presumption of correctness, and petitioner has not submitted sufficient evidence here to overcome that presumption. Welch v. Helvering,290 U.S. 111 (1933); Rockwell v. Commissioner,512 F.2d 882, 886 (9th Cir. 1975), affg. a Memorandum Opinion of this Court, cert. denied 423 U.S. 1015 (1975). Muelhaupt's testimony on this issue was merely conclusory. Therefore, we find that petitioner is not entitled to ITC for the special equipment basis. Conclusion We hold that petitioner is not entitled to ITC with respect to the East Property *325 in an amount greater than the amount already allowed by respondent. The parties have agreed that, in regards to the South Des Moines Building, petitioner placed in service during the 1979 taxable year qualified "section 38 property" in the amount of $ 16,685.61 instead of $ 33,371.21, and that the amount of investment tax credit for 1979 claimed by petitioner in regards to the South Des Moines Building is to be reduced by $ 1,685.06. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. The deficiency for 1976 arose from respondent's disallowance of unused investment tax credits from 1979 in the amount of $ 73,958 which petitioner had carried back to 1976 and for which petitioner had received a refund of corporate income tax of $ 75,777. Thus, the determination of the amount of the allowable investment tax credit for 1979 will resolve the dispute for 1976. ↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in issue and all rule references are to the Tax Court Rules of Practice and Procedure unless otherwise noted. ↩
3. According to the IRS Engineer's report, the cost of the railroad spur line as documented by the subcontractor was $ 46,737. If an additional ten percent is added to this cost for the general contractor, the total comes to $ 51,411. The record does not explain the discrepancy between the amount of the railroad spur as related by Meulhaupt and the amount verified by the respondent. ↩
4. The parties stipulated that the disallowed investment amount was $ 1,507,339.26. The difference appears to be the result of a small mathematical error which has no effect on the outcome of this case. ↩
5. The parties have stipulated that handling equipment, in the amount of $ 228,157.07, includes forklift trucks and the racks upon which the products are placed in the freezer. In addition, the parties have stipulated that machinery, in the amount of $ 486,717.65 includes refrigeration equipment and controls, piping, and the installation of the equipment. The parties also have stipulated that the ITC claimed for the handling equipment and machinery has been allowed by respondent and is not in dispute in this case. ↩
6. The record does not describe this "racking core." This absence of information leaves us in a quandary since we do not know whether petitioner is claiming ITC merely for the assembly of the metal racks themselves, which would be allowable as part of the basis of the equipment pursuant to section 1.46-3(c)(1), Income Tax Regs., or for the installation of a separate racking core used to affix the racks to the structure or for some other purpose. Since petitioner has the burden of proof, it must suffer the consequences of an inadequate record. See Samis v. Commissioner,76 T.C. 609, 617 (1981). Therefore, from this record we have based our determination of this issue on the assumption that the racking core at issue is separate from the metal racks themselves. Our focus, thus, must be on the individual structural components of the racking core, of which we know nothing, rather than upon the metal racks themselves. See Munford, Inc. v. Commissioner,87 T.C. 463, 492 (1986); Weirick v. Commissioner,62 T.C. 446↩ (1974). 7. See Morrison Inc. v. Commissioner,T.C. Memo. 1986-129↩.